**HUGOTON PRODUCTION COMPANY**
v.
**The UNITED STATES.**
No. 46-60.

United States Court of Claims.
July 16, 1965.

John P. Lipscomb, Jr., Washington, D. C., for plaintiff.

Theodore D. Peyser, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for defendant C. Moxley Featherston, Lyle M. Turner and Philip R. Miller, Washington, D. C., of counsel.

Before LARAMORE, Acting Chief Judge, REED, Justice (Ret.), sitting by designation, DURFEE and DAVIS, Judges, and JONES, Senior Judge.

REED, Justice (Ret.), sitting by designation.[*]

This case was formerly heard here on the evidence and report of the Trial Commissioner and remanded to him for further proceedings under this court's opinion then entered. 161 Ct.Cl. 274, 315 F.2d 868 (1963). As was the situation previously, the plaintiff contends that incorrect standards have been applied in order to determine the amount of depletion allowance it was entitled to during the six calendar years within the period from 1952 through 1957.[1]

The plaintiff produces, transports and processes natural gas from a portion of the Hugoton Field located in the State of Kansas.[2] As the holder of an economic interest in gas wells, it was therefore entitled to take, as a deduction from income, $27\frac{1}{2}$ percent of its "gross income from the property."[3] The applicable Regulation defining gross income states:

(1) In the case of oil and gas wells, "gross income from the property" * * * means the amount for which the taxpayer sells the oil and gas in the immediate vicinity of the well. *If the oil and gas are not sold on the property but are manufactured or converted into a refined product prior to sale, or are transported from the property prior to sale, the gross income from the property shall be assumed to be equivalent to the representative market or field price (as of the date of sale) of the oil and gas before conversion or transportation.* (Emphasis added.)[4]

---

[*] All findings of fact necessary to support this opinion are included in this text.

1. The Tenth Circuit on three separate occasions has been faced with a case involving the amount of depletion to be allowed an integrated miner-manufacturer. The last decision resulted in a remand. See United States v. Portland Cement Co., 338 F.2d 798 (10th Cir. 1964).

2. For a complete description both as to plaintiff's situs and business operations, see 161 Ct.Cl. at 291–308, 315 F.2d at 878–88 (Commissioner's Findings Nos. 4–39).

3. Section 114(b) (3) of the 1939 Code reads:
"Percentage depletion for oil and gas wells. In the case of oil and gas wells the allowance for depletion under section 23(m) shall be $27\frac{1}{2}$ per centum of the gross income an amount equal to any the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 per

centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance under section 23(m) be less than it would be if computed without reference to this paragraph." 53 Stat. 45. Essentially the same provisions are contained in the Int.Rev.Code of 1954, § 613.
Section 23 of the 1939 Code provides:
"* * * In computing net income there shall be allowed as deductions:
* * * * *
(m) Depletion. In the case of mines, oil and gas wells, * * * a reasonable allowance for depletion * * * according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner * * *" 53 Stat. 14. Essentially the same provisions are contained in the Int.Rev.Code of 1954, § 611 (a).

4. Treas.Reg. 118 § 39.23(m)—1(e) (1). The Regulation is essentially unchanged under the 1954 Code. See Treas.Reg. § 1.613–3(a).

On February 4, 1960, the plaintiff instituted the present action alleging overpayment of taxes during the six years in question. It argued that the literal interpretation of the Regulation called for gross income to be determined by multiplying the quantity of gas which was processed and sold in each year by an amount determined to be the "representative market or field price" for its gas at the wellhead less, of course, royalty payments.[5] 161 Ct.Cl. at 278, 315 F.2d at 870. This procedure, referred to as the "market comparison" method, necessarily required a study of sales of similar gas at the wellhead by other producers comparably situated.

The Government filed a counterclaim and took the position that there were no comparable sales and that under such circumstances a "proportionate profits" or "roll back" formula should be utilized. As applied to plaintiff's situation, the proposed method entailed taking the gross proceeds from the sale of plaintiff's processed gas and by-products and subtracting therefrom all costs attributable to gathering and processing, a ten percent return on the capital invested in these nonproducing functions and all royalty payments. See 161 Ct.Cl. at 278, 315 F.2d at 870. The difference was then treated as the gross income from the property.[6]

Our decision was essentially in accord with plaintiff's theory of the case. We held that under the Regulation "the representative price for each tax year [should be] calculated as the average price, weighted by quantity, of comparable gas sold in the locality under a fair selection of contracts in effect during each year * * *" 161 Ct.Cl. at 289, 315 F.2d at 877. The Government's contention that there were no comparable wellhead sales was dismissed on the basis of evidence presented by the plaintiff relating to some twenty contracts for the sale of similar gas entered into by other companies during the tax years in question. At that time we noted:

> Plaintiff presented expert testimony to the effect that the gas involved in the particular contracts was comparable to plaintiff's gas and that the price obtained in those contracts was the minimum amount which plaintiff would have obtained for the sale of its gas at the wellhead during the respective years. [161 Ct.Cl. at 281, 315 F.2d at 872.]

The case was remanded, however, on the basis of our holding that the representative market or field price had to be determined by securing the weighted average of all contracts in effect each year under which comparable gas was sold rather than merely considering the contracts entered into during a specific tax year.

The question of what was "comparable gas" presented no serious question at that time. In accord with certain factors that the plaintiff deemed relevant to a determination of the price that a seller of natural gas could command for his product at the wellhead,[7] the Commis-

---

5. Plaintiff argued: "What defendant overlooks is the command of the Treasury regulation * * * that plaintiff is presumed (even though in fact it did not) to have sold its raw natural gas at the wellhead at a price equal to the 'representative market price'. Once that price is established, it matters not under the regulation whether transactions away from the wellhead are profitable or not." Reply Brief for Plaintiff, p. 10. This statement is of some interest when viewed in the light of present contentions.

6. This is a modified Fiske formula. See Fiske, Federal Taxation of Oil & Gas Transactions 116 (1961).

7. Pursuant to evidence presented by the plaintiff, the Commissioner found that for the tax years in question the following factors influenced the price that a seller of natural gas could command for his product in the Hugoton Embayment:

 "(a) The volume available for sale. Generally, the greater the volume or reserves, the greater the price the seller could command.

 (b) The location of the leases or acreage involved, whether in a solid block or

sioner had found that plaintiff's natural gas rated as follows: (1) its reserves were far above the average available; (2) the leased acreage was well-blocked and compactly situated; (3) its gas was average as to quality; (4) the delivery point was better than average from the standpoint of costs of connection; (5) the heating value of the gas was average; (6) the gas wells had a deliverability above average because the producing formation had greater thickness and higher permeability; and (7) the delivery or rock pressure was average.[8] No exceptions were taken to these findings and they were approved in our first decision.

On remand the Government located what it felt to be producers of natural gas operating under essentially the same conditions as described above.[9] Weighted average prices for each taxable year in question were thereafter computed on the basis of wellhead sales made by these companies.[10] The Commissioner found the resulting representative prices to be conclusive evidence of the value of plaintiff's gas at the wellhead. This finding is excepted to by the plaintiff.

Although the weighted averages are undoubtedly derived from contracts made by producers whose physical characteristics of production are comparable with those which the plaintiff deemed important during the earlier stages of this litigation, it is urged that the representative prices derived therefrom must be rejected since they only take into consideration sales made in interstate commerce. Plaintiff contends that such sales are not comparable due to the fact that during the period in question it was engaged solely in intrastate business.[11] This factor is said to be critical since intrastate gas is located much closer to the market outlet and therefore is capable of commanding higher prices.[12] In these circumstances, and in light of the fact that there were no comparable in-

scattered, and their proximity to prospective buyers' pipelines.

(c) Quality of the gas as to freedom from hydrogen sulphide in excess of 1 grain per 100 cubic feet.

(d) Delivery point.

(e) Heating value of the gas.

(f) Deliverability of the wells. The larger the volume that could be delivered from a reserve, the greater the price the seller could command.

(g) Delivery or rock pressure. The higher the pressure, the less compression for transportation is required." 161 Ct.Cl. at 320, 315 F.2d at 894–895. (Finding No. 61).

8. See 161 Ct.Cl. at 320–321, 315 F.2d at 895 (Finding No. 62).

9. Our Commissioner found that (1) all of the gas was sold at the wellhead; (2) the gas was produced from a relatively large number of wells (in 1957, 445 wells as compared with plaintiff's 152 wells); (3) the gas was produced from a relatively large number of acres (in 1957, 276,133 acres as compared with plaintiff's 96,358 acres); (4) all of the acreage was within 30 miles of plaintiff's acreage; (5) the deliverability of the wells was good; (6) the average wellhead shut-in pressure was within a very close magnitude of that of the plaintiff's; (7) the B.t.u. was in most cases good; (8) the remaining reserves were excellent; and (9) the acreage under each of the contracts considered was either a large block or was easily connected to the gathering system of the purchaser.

10. See note 10 on page 422.

11. The greatest percentage of plaintiff's business went to Kansas Power & Light Company. In 1948 it entered into a fifteen year contract agreeing to sell at least 80 percent of certain volumes of natural gas to that company. For a detailed analysis of plaintiff's sales see 161 Ct.Cl. at 302–306, 315 F.2d at 884–886. (Commissioner's Findings Nos. 27–34).

12. Plaintiff further alleges that intrastate gas is capable of commanding a higher price since it falls within the purview of the Kansas Minimum Price Order. This contention will be dealt with later in the opinion.

trastate sales during the period in question,[13] plaintiff adopts the position first taken by the Government, i. e., that in the absence of comparative sales a proportionate profits formula is the only reasonable means of computing gross income for depletion purposes.

This is a novel argument, both to the instant case and to the history of oil and gas litigation. No case has been cited nor found making any similar contention concerning the uniqueness of intrastate gas; nor do any of the leading texts concerning the oil and gas field allude

10. The representative market price for 1951 was 7.0451 cents; for 1952, 7.1675 cents; for 1953, 7.1688 cents; for 1954, 10.0405 cents; for 1955, 10.0370 cents; for 1956, 9.8481 cents; and for 1957, 10.1658 cents.

An example of the computations utilized in reaching the representative market price is the year 1954:

| Purchaser, Producer | Contract date | Volume sold | Net amt. paid | Weighted average price in cents per Mcf |
|---|---|---|---|---|
| Cities Serv. Gas Co.: | | | | |
| The Texas Co. and Columbian Fuel Corp. | 6–16–49 | 43,293 | $2,988.69 | .......... |
| The Texas Co. and Columbian Fuel Corp. | 6–16–49 | 2,990,141 | 206,421.39 | .......... |
| Western Nat. Gas Co. | 12–29–49 | 339,019 | 24,227.31 | .......... |
| Western Nat. Gas Co. | 12–29–49 | 7,955,486 | 568,522.90 | .......... |
| Kans.-Nebr. Natural Gas Co.: | | | | |
| Deerfield-Kearney Gas Production Co. | 12–29–49 | 11,177,092 | 1,229,480.17 | .......... |
| Northern Nat. Gas Co.: | | | | |
| Republic Nat. Gas Co. | 9–13–45 | 7,723,743 | } 2,223,211.86 | .......... |
| Republic Nat. Gas Co. | 12–21–45 | 17,154,845 | | |
| Panhandle Eastern P. L. Co.: | | | | |
| Dunne-Hoffman | 11–5–49 | 583,097 | 56,820.38 | .......... |
| Island Gas Co. | 12–14–49 | 975,667 | 106,812.77 | .......... |
| Dorchester | 2–22–46 | 1,027,664 | 106,036.84 | .......... |
| Dorchester | 12–1–46 | 1,622,776 | 177,658.50 | .......... |
| Saturn Oil & Gas Co. | 7–27–37 | 2,717,528 | } 285,976.79 | .......... |
| Saturn Oil & Gas Co. | 8–4–37 | 90,952 | | |
| Saturn Oil & Gas Co. | 7–27–37 | 94,585 | | |
| Colorado Interstate Gas Co.: | | | | |
| Sinclair Oil & Gas Co. | 12–19–47 | 1,875,158 | } 220,240.47 | .......... |
| Sinclair Oil & Gas Co. | 6–30–48 | 320,902 | | |
| Sinclair Oil & Gas Co. | 10–10–50 | 115,907 | | |
| American Gas Prod. Co. | 2–2–53 | 22,629,332 | 2,715,520.00 | .......... |
| American Gas Prod. Co. | 10–20–53 | 1,059,699 | 151,061.00 | .......... |
| J. M. Huber Corp. | 3–19–54 | 21,783 | 2,996.00 | .......... |
| Southwestern Expl. Co. | 4–8–54 | 158,983 | 22,782.00 | .......... |
| | | 80,680,652 | 8,100,757.07 | 10.0405 |

13. On remand our Commissioner found that the percentage of gas purchased in Kansas which went into interstate, rather than intrastate, commerce was approximately 90.5 in 1951, 90 in 1953, 89 in 1955, and 86½ in 1957. For the years 1951–1957 there were no comparable intrastate sales of gas at the wellhead. The only Kansas intrastate sales of any magnitude were for gas produced at pressures much higher than plaintiff's and were for gas produced away from the local geographical area of plaintiff's acreage.

to this factor in its present context.[14] This does not mean that the argument is totally without merit. In the proceedings before the Commissioner various witnesses testified as to the distinction. Even more specifically plaintiff aptly demonstrated that although *its* gas may have been similar to that sold into interstate commerce, the spread between the price which was received (after processing) and the representative market or field price as computed by the Government's weighted averages (reflecting sales of similar gas at the wellhead) cannot be attributed solely to the gathering, dehydration and absorption processes involved in the plaintiff's operation.[15] This evidence, plaintiff argues, not only indicates that the resulting weighted averages are not representative of the value of plaintiff's gas at the wellhead (due to lack of economic comparability), but also gives rise to the substantial argument that since the averages fail to take into consideration plaintiff's seemingly singular economic position, adoption by this court of the Commissioner's findings would deprive it of a depletion allowance commensurate with business activities.

A parallel to plaintiff's case is the recent decision by the Fifth Circuit in United States v. Henderson Clay Prod., 324 F.2d 7 (5th Cir. 1963). The principal question presented involved the amount of depletion to be allowed an integrated miner-manufacturer which processed mined ball clay into brick. In

14. One writer, however, does make a brief reference to the significance of the contract between plaintiff and the Kansas Power & Light Company. See footnote 11 supra. The author notes that an unusually high price was paid for the gas which *"may* have been due to the advantages of location to the buyer." Neuner, The Natural Gas Industry, Monopoly and Competition in Field Markets 121 (1960). (Emphasis added.) This statement leads to the question of whether plaintiff is attempting to set up a "straw man" by distinguishing between interstate and intrastate gas since the crucial factor would appear to be proximity to buyer. In this sense state lines are of no import save the application of the state minimum price ordered referred to in footnote 12 supra.

15. At the rehearing of this case, plaintiff, through a series of exhibits, explored the impact of the weighted-average prices as calculated by the Government. The Government's weighted-average prices were used as the value of plaintiff's production of natural gas at the wellhead. From plaintiff's total gross receipts from its entire operations there was subtracted its entire costs, including depreciation, of operating its non-producing facilities, i. e., field or gathering lines and gasoline plant, and the value of plaintiff's production at the wellhead as assumed above. The remainder, then, represented a return on plaintiff's investment in its non-producing activities. This return, expressed in cents per Mcf and in percentage, is as follows:

| | Year | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1951 | 1952 | 1953 | 1954 | 1955 | 1956 | 1957 |
| Gross receipts per Mcf ... | 14.86¢ | 16.55¢ | 16.22¢ | 16.35¢ | 17.36¢ | 17.46¢ | 17.62¢ |
| Less: Cost of operating non-producing activities and value of gas at wellhead per Mcf .......... | 8.23¢ | 9.11¢ | 9.21¢ | 11.83¢ | 11.79¢ | 11.45¢ | 11.76¢ |
| Return on investment in non-producing activities per Mcf .............. | 6.63¢ | 7.44¢ | 7.01¢ | 4.52¢ | 5.57¢ | 6.01¢ | 5.86¢ |
| Rate of return on investment ................. | 44.7% | 48.8% | 48.2% | 32.4% | 41.9% | 49.4% | 52.7% |

Thereafter plaintiff produced expert testimony that the average rate of return is normally in the area of 10 percent.

simplified terms the Fifth Circuit was forced to look for the value of clay at the mouth of the mine [16] as we are forced to ascertain the value of natural gas at the wellhead. In this context the court was faced with a similar problem.

The taxpayer urged that in determining gross income the market comparison method should be used. In support of this theory, credible evidence that there was a national market for similar clay at $10.50 a ton had been introduced and accepted as conclusive by the trial court. On appeal, however, such a proposal was found to be "highly indigestible" since the taxpayer was only selling its brick for $8.75 a ton. Quoting our first opinion with approval, the court noted that adoption of the market comparison method would result in casting commercial realities aside since, in no sense, could the price of $10.50 a ton be said to be "representative" of the taxpayer's economic situation. Thereafter, and for reasons which we will discuss in detail, it was held that the taxpayer must use a proportionate profits formula for computing depletion allowance since this method would more clearly approximate the taxpayer's gross income from its mining activities.

On the basis of this brief analysis plaintiff analogizes Henderson to the facts of the instant case. It assumes two natural gas producers, A and B, each of which gathers and processes his gas before sale, A obtaining 15 cents per Mcf for his gas, while B's price is only 5 cents. It is urged that on this simple set of facts the weighted average price computations adopted by the Commis-

sioner are unacceptable. These prices are:

| Year | Weighted average price per Mcf |
|------|-------------------------------|
| | (Cents) |
| 1951 | 7.0451 |
| 1952 | 7.1675 |
| 1953 | 7.1688 |
| 1954 | 10.0405 |
| 1955 | 10.0370 |
| 1956 | 9.8481 |
| 1957 | 10.1658 |

It is pointed out that in the case of producer B the hypothetical gross income in each of the taxable years even though based on actual sales of other producers at the wellhead would exceed B's actual gross income from gathering and processing natural gas. In this aspect the situation is contended to be identical with Henderson and accordingly demands the utilization of a proportionate profits formula.

Examining the converse situation of producer A plaintiff argues that if the weighted average prices of seven and a fraction cents for 1951 through 1953 result in attributing to the gathering and processing operations a completely unrealistic amount of income (about 8 cents per Mcf) such prices must in turn be nonrepresentative in the same sense. This is contended to be the situation presented by the facts of the instant case. As previously noted, plaintiff produced expert witnesses, who, after studying plaintiff's operation and income, unanimously concluded that the weighted average prices presented by the Government and adopted by the Commissioner are unrealistic and nonrepresentative. Their reasoning was based on the fact the rates of return for the years 1952 through

16. The Supreme Court in United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581 (1960), stated that the depletion allowance for an integrated miner-manufacturer should be based on the value of the mineral at the point where the non-integrated miner disposes of it. Later, in Riddell v. Monolith Portland Cement Co., 371 U.S. 537, 538, 83 S.Ct. 378, 379, 9 L.Ed.2d 492 (1963), the Court relied on Cannelton and held that "the statutory percentage depletion allowance * * * should be cut off at the point where the mineral first became suitable for industrial use or consumption."

1957 on plaintiff's investment in its non-producing facilities—as reflected by the weighted averages—is for the most part some thirty to forty percent higher than could reasonably be expected.[17]

Two factors lead us to the conclusion that such evidence is immaterial to the ultimate resolution of the case. First we reject plaintiff's somewhat simplified reasoning that the Fifth Circuit decision resulted in a sweeping rejection of the market comparison method simply because, on the facts presented, it produced results not economically representative of the taxpayer's integrated business. This somewhat complex opinion rests on a much more substantial foundation than a mere cause and effect analysis indicates.

In 1960 the United States Supreme Court rendered the landmark decision of United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S.Ct. 1581. Although couched in terms of depletion allowance for an integrated miner-manufacturer, its holding applies to all depletion controversies in which integrated producers are involved. The basic theory underlying the case is the fulfillment of the congressional objective that an integrated processor should not have a preference and a resulting *competitive* advantage over the non-integrated producer. Accordingly, the Court held that depletion allowance is intended to be based on the *constructive income* from a raw product[18] if marketable in that form and not on the value of the finished article.[19]

In eschewing the market comparison method as a means of computing the required constructive income, the court in Henderson carefully pointed out that although there were other miners producing the same grade or quality of clay as that of the taxpayers, they were by no means competitors. The reason for this was quite simple. All other miners of similar clay were selling the mined product to companies in the ceramics industry. To compete in this market additional costs were incurred for advertising, management and research—all tending to raise the ultimate value of the raw material. However, the taxpayer's secretary-treasurer and general manager testified that it was not possible to sell its clay in the raw state because, being a relatively new company with limited capital, it could not afford to install the extra equipment, processing, research, management and engineering departments required in order to sell ball clay. On the basis of this testimony the court said:

> It is not an unfair inference that * * * [the taxpayer] found it more profitable and easier to sell

17. See footnote 15 and accompanying text supra.

18. The case is strongly reminiscent of earlier cases involving the theory of depletion for integrated processors in the oil and gas industry. The Third Circuit as early as 1935 said: "If, as the taxpayer contends, the allowance was based on the value of its sales of gas to its consumers, the taxpayer would in effect enjoy an allowance for depletion on its distributing system which is already subject to an allowance for depreciation, and it would, since it both produces and distributes natural gas at retail, enjoy an unusual advantage over the mere producer of gas in the field." Greensboro Gas Co. v. Commissioner, 79 F.2d 701 (3d Cir. 1935). See also Consumers Natural Gas Co. v. Commissioner, 78 F.2d 161 (2d Cir. 1935); Brea Cannon Oil Co. v. Commissioner, 77 F.2d 67 (9th Cir. 1935). This rule, however, did not apply to the mining industry where integrated producers were successful in having their depletion base measured by their own "commercially marketable mineral products," i.e., the products which they sold. See, e. g., United States v. Cherokee Brick & Tile Co., 218 F.2d 424 (5th Cir. 1955). This led not only the Supreme Court but Congress as well 'to re-examine and redefine the base for percentage depletion deduction for minerals. Comment, Percentage Depletion and the Integrated Miner-Manufacturer, 28 U. Chi.L.Rev. 121 (1961); Taubeneck, The Depletion Base Controversy, 46 A.B.A.J. 1136 (1960).

19. No issue was presented as to what *method* should be used to compute "constructive income" from the raw material.

brick for a smaller gross income per ton than to incur the expenses and increase the business complications involved in merchandising the clay on a nation-wide scale against experienced competitors. [324 F.2d at 10.]

In this context, and pursuant to Cannelton, rejection of the market comparison method necessarily followed. First, by using this method the depletion allowance for the taxpayer would not be limited to its income from the marketable product closest to the raw mineral since an allowance of $10.50 per ton would give it credit for expenses it never incurred. Secondly, and of even greater importance, the representative dollar value reached by the market comparison method in no sense reflected taxpayer's constructive income, i. e., "the price which a nonintegrated brick manufacture would pay for clay to make brick," since there was a complete absence of competition between the taxpayer and miners of similar clay.

■■ Plaintiff argues in the alternative that even if a mere showing of disproportionate prices is not enough to force the utilization of a proportionate profits formula, the facts of the instant case are still comparable to Henderson due to the fact that there were no comparative (competitive) intrastate sales at the wellhead. The underlying situation, however, is the complete opposite of that presented in Henderson. There it was specifically found that "[t]here is nothing in the record to indicate that if the taxpayer had chosen to sell raw ball clay that it would have received [the representative market price of] $10.50 per ton * * *" 324 F.2d at 13. This necessarily was due to the fact that the taxpayer was by no means financially able to enter into the highly competitive market of ceramics. No such economic factor is here present and plaintiff makes no contention to the effect that if it were free to sell its gas at the wellhead it would not be in competition with other producers of similar natural gas for both intrastate and interstate business.[20] In this crucial sense the weighted average prices of wellhead sales are based on comparative sales. As such, the representative prices reflected are conclusive at the value of plaintiff's gas at the wellhead.

■ Having decided that plaintiff would have been actively competitive for wellhead sales, we further conclude that by permitting it access to a proportionate profits formula we would be violating the spirit of Cannelton. The plaintiff was commanding a disproportionately higher price for its gas than its competitors during the years in question. We conclude that this was true solely because it chose to integrate.[21] By using a proportionate profits formula, which is inextricably tied to the ultimate sales price, we would therefore be giving the plaintiff credit for enhancing the value of its gas *after* it left the wellhead. Cannelton tells us this cannot be done since, for purposes of depletion, integrated producers are to be treated on the same

---

**20.** Plaintiff has in effect admitted that it is in competition with producers of gas going into interstate commerce. At our Commissioner's first hearing of this case, it placed into evidence twenty contracts for the sale of gas to interstate pipeline companies on the ground that they were "as representative as was possible of plaintiff's gas in the Hugoton Lease Block," and asked that representative market or field prices for its gas be computed on the basis of these interstate sales. On remand, one of plaintiff's witnesses testified that there was but one comparable sale and this was to Michigan Wisconsin Pipe Line, an interstate pipe-

line company. It is also significant that the price Kansas Power & Light paid the plaintiff for its gas was tied to the weighted average price paid by four interstate pipeline companies for gas in the Kansas portion of the Hugoton Field. See 161 Ct.Cl. at 286, 315 F.2d at 875.

**21.** This conclusion does not *ipso facto* reject plaintiff's contention concerning the alleged distinction between interstate and intrastate gas. Rather, it is based on the fact that nothing appears in the record which in any way indicates that if plaintiff were selling its gas at the wellhead it would be making intrastate sales.

footing as those of his competitors who choose not to integrate. Having established a representative wellhead price, those processes increasing the value of the gas must necessarily be held to be of no consequence. Accordingly, we reject any proportionate profits formula because of the resulting economic advantage it would give the plaintiff.[22]

As we have indicated, still another factor leads us to the conclusion that the market comparison method is correctly applied to the facts of this case. The court in Henderson decided the case under the provisions of the 1939 Code. Section 23(m) established the basic proposition that a "reasonable allowance for depletion" is to be given in the case of "mines, oil and gas wells, other natural deposits, and timber." This section further stipulated that the allowance is to be made in all cases "under rules and regulations * * * prescribed by the Commissioner * * *"[23] In the area of mining, the Commissioner prescribed that gross income for an integrated producer was to be established by taking the "representative market or field price * * * of a mineral product of like kind and grade as beneficiated by the ordinary treatment processes actually applied, before transportation of such product * * *" However, if there was no representative price for the depletable mineral, the Regulations specifically provided for the utilization of a proportionate profits method to determine the constructive income for the property.[24] Accordingly, the court was well within judicial limits when, after finding that there was no representative market or field price (due to lack of competition), it authorized the alternative use of a proportionate profits formula.

No such choice has been prescribed by the Commissioner in the oil and gas field. As can be seen clearly from the Regulation quoted earlier in this opinion, he has chosen to embody in it only one concept—"representative market or field price." For reasons discussed in detail in our initial opinion, no citation is needed to support the proposition that the Regulation is of unquestioned validity nor has such a contention been made by either party to this case. Moreover, little consideration need be given to the question of whether it implicitly authorizes a proportionate profits method. The "representative market or field price" required by the Regulation demands the utilization of an accounting system which considers comparative sales. By using a proportionate profits formula, no consideration is given to competitors. One method contradicts the other, and as such, we agree with the Tax Court that a literal reading of the Regulation forecloses any consideration of a proportionate profits formula. Shamrock Oil & Gas Corp., 35 T.C. 979, 1034 (1961) aff'd, 346 F.2d 377, (5th Cir. 1965); cf. United States v. Henderson Clay Prod., supra.

Plaintiff does not argue with these conclusions but seeks instead to avoid the effect of the Regulation on three grounds. First, it is argued that there is no representative market price and under such circumstances reliance must be placed on a proportionate profits method in order to determine constructive income. Second, the argument is made that the administrative interpretation and application of the Regulation by the Service has never sanctioned the use of weighted average prices of others for the determination of a gas producer's income from property. Finally, it is contended

---

22. Plaintiff employed two experts who utilized proportionate profits formulas to compute the value of plaintiff's gas at the wellhead. On the whole, their computations resulted in a value some four to five cents higher than that reached by the market comparison method.

23. See footnote 3 supra.

24. Treas.Reg. 118 § 39.23(m)–(1) (e) (3).

that the market comparison method is unworkable.

The first contention needs little comment as plaintiff repeats its basic argument that it is involved in intrastate business and therefore cannot be compared to producers of natural gas selling to interstate companies. We have already made it clear that this line of reasoning fails to take into account the fact that in the crucial context of sales at the wellhead, plaintiff would indeed be in competition with other producers of natural gas. We definitely are not faced with a situation in which the market comparison method is not capable of being applied.

■ In support of its second argument the plaintiff called two former Revenue Service agents who testified that during the period they were employed by the Government (which includes the tax years here in question) they did not use the market comparison method to compute representative market or field prices. They testified that their policy was to analyze each individual producer separately in order to determine which factors were relevant in determining gross income. Important indicia included, *inter alia*, gas sales as well as royalties paid by the producer to his lessors. If this procedure did not supply a satisfactory answer the agents were then in agreement that a simple roll-back formula was applied.

■ There can be no question that these two witnesses were expert in their field [25] and therefore highly qualified to discuss depletion allowance for integrated producers. However, their testimony cannot be said to be binding on the Service as to its interpretation of the Regulation. Where weight has been given to administrative practice or policy, the practice or policy has been in the form of Treasury Regulations or officially published and sanctioned memoranda and then only on the theory that because of their long standing they have received congressional approval, Helvering v. Winmill, 305 U.S. 79, 83, 59 S.Ct. 45, 83 L. Ed. 52 (1938), or on the basis that they constitute contemporary construction of the revenue statute by those charged with the administration thereof. Commissioner of Internal Revenue v. South Texas Lumber Co., 333 U.S. 496, 501, 68 S.Ct. 695, 92 L.Ed. 831 (1948); cf. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1964).[26] In light of the fact that plaintiff has failed to produce any tangible evidence to the effect that the administrative policy was other than set forth by the Regulations we are

25. Mr. Rowland W. Kezer is now retired. Mr. Kezer is a petroleum engineer and from September 1921 until February 1957 he was with the Service as an oil and gas engineer. From 1951 through 1957 he was assistant chief, Natural Resources Section in the National Office. During the entire time he was with the Service he specialized in natural gas cases. He estimated that during his career he was connected with roughly over a thousand natural gas depletion cases.

Mr. Leland E. Fiske holds a degree as a mining engineer and is also a certified public accountant and attorney-at-law. For eighteen years Mr. Fiske was the chief oil and gas engineer of the Service for the Dallas, Texas, region. Mr. Fiske has also written numerous articles as well as a book on oil and gas taxation. See Fiske, op cit. supra footnote 6.

26. As noted previously, when this case was in its initial stages of litigation the government contended that a proportionate profits formula was necessitated due to the *complete absence* of comparative sales. No argument was made to the effect that such a formula was authorized *regardless* of whether or not a competitive market existed. What little has been written on this subject by the legal commentators indicates that only under unique circumstances, e. g., cycling plant operations, has a proportionate profits formula been applied. See Randolph, Depletion Problems Including those Arising from the Hudson & Abercrombie Decisions, N.Y.U. 9th Inst. on Fed.Tax. 491, 494–96 (1951). But cf. Breeding & Burton, Income Taxation of Oil & Gas Products 1110–13 (1961). A further indication that weighted averages have been used by the Commissioner under normal conditions is the fact that a market comparison method was used by the Government in Shamrock.

compelled to dismiss the argument as being without merit.[27]

As we understand plaintiff's final argument, it is urged that the market comparison method, as utilized to find the representative market or field price, is entirely unworkable—both from the standpoint of taxpayers generally as well as the IRS. In support of this proposition, it is asserted that both parties experienced serious difficulties in making the computations on remand. The Government, however, states that it experienced no such difficulty. Brief for the Defendant, p. 20. As for the plaintiff, the opposite may well be true. While the Government contented itself with a strict compliance to the scope of the remand a great deal of evidence was submitted by the plaintiff which was pointed, in the main, towards demonstrating the difficulties and complications involved in applying the market comparison method.[28] This "additional evidence" speaks for itself. We do not have the slightest doubt that the time and money expended to amass the information is beyond the capabilities of taxpayers generally and does not lend itself in any sense to a workable taxing scheme.

We cannot judge by what the plaintiff has done. Instead, we direct our attention to what should have been done and the difficulties involved therein. Looked at in this light, plaintiff's argument focuses on the proposition that it would not be practicable for a taxpayer to make a timely return due to the inaccessibility of annual reports (Form 2s) filed by interstate pipeline companies with the Federal Power Commission.[29] This line of reasoning is contradicted by testimony before the Commissioner[30] and fails to take into consideration the availability of an extension of time of up to six months under Section 6081 of the 1954 Code.[31] During this period we see no reason why the necessary information needed for a weighted average comparison for the current tax year cannot be obtained.[32]

Nor can we, as plaintiff strongly argues, construe from the actions of the Government that the securance of a weighted average price has inherent difficulties not compatible with sound tax administration. Subsequent to our re-

27. Even if a contrary practice were established, it could hardly be binding if contrary to law. United States v. Mississippi Chem. Co., 326 F.2d 569, 574–575 (5th Cir. 1964). Although we need not reach the question, our interpretation of Cannelton would necessarily require a holding that the proportionate profits method, as applied to the facts of this case, would violate the principles therein established.

28. We held in our first opinion that the weighted average prices should be derived from comparable producers in the locality. Plaintiff submitted prices from the entire Embayment area without regard to whether the contracts considered were made by comparable producers. We also held in that opinion that comparable sales should not be excluded by reason of the date they were entered into. Plaintiff submitted four different computations, three of which were based on contracts entered into within specified periods.

29. These reports contain the prices and volumes capable of being used in computing the weighted average prices for each taxable year.

30. Albert Goodpasture, who is employed as a supervisor of the tax section of the Controller's Department of Panhandle Eastern Pipeline Company, testified for the plaintiff. He stated that although the filing date for Form 2s is March 31, his company usually got an extension until April 30 in which to file. It may be concluded that even considering extensions the reports would be available early in May.

31. "General rule.—The Secretary * * * may grant a reasonable extension of time for filing any return, * * * required by this title or by regulations. Except in the case of taxpayers who are abroad, no such extension shall be for more than 6 months." Int.Rev.Code of 1954, § 6081 (a). The filing date for corporations is March 15. Int.Rev.Code of 1954, § 6072 (b). Thus, an extension could be had until September 15. As noted, footnote 30 supra, the Form 2s are available by early May at the latest. This would leave more than four months in which to compute the tax.

32. See footnotes 30 and 31 supra.

mand the Government waited a period of five months and then hired a specialist to compute the required averages. Although counsel states that no difficulties were encountered, these actions are left unexplained. We do not, however, feel constrained to hold that "the facts speak for themselves."

At the time the first opinion was written we could not ignore the fact that only one prior decision had been rendered on the precise question of what method should be utilized for computing depletion allowance for an integrated natural gas producer. Shamrock Oil & Gas Corp., supra. Having entered into this virgin territory we fully expected some practical difficulties to be encountered. This was especially true in light of the fact that a total of six tax years were involved. Therefore, the fact that after some delay the Government hired an expert [33] does not indicate that such trouble would be encountered in *normal* years after the weighted average system has once been set up. No doubt the Commissioner of Internal Revenue is well aware of litigation in this area. If for some reason he finds that the market comparison method is not generally workable then he would be within the ambit of his statutory powers to amend the applicable Regulation to provide some alternative method.[34] Until that time we feel that it is not within our judicial powers to legislate in his place.

Having dealt with all contentions regarding the question of whether a proportionate profits formula should be adopted, we now turn to plaintiff's specific objections to the Commissioner's findings. As we have noted previously, the Government introduced into evidence

what it thought to be "the average price, weighted by quantity, of comparable gas sold in the locality under a fair selection of contracts in effect during each year." The Commissioner found such evidence to be convincing and adopted the same as his findings.

The plaintiff argues that the competitive purchase area to be considered was the entire Hugoton Embayment and that the Commissioner committed error by considering only comparative contracts selected from part of the Kansas Hugoton Field and the nearby Greenwood Field. We disagree. Although in our first opinion there is language referring to the larger Embayment area, this was placed in a context of deciding, in accordance with the evidence then presented by the plaintiff, that there were indeed comparative sales which could be utilized in finding the representative market or field price via the market comparison method. Our remand, however, called for comparable sales in the "locality," and cited with approval Phillips Pet. Co. v. Bynum, 155 F.2d 196, (5th Cir. 1946) and Shamrock Oil & Gas Corp., supra. Phillips held that the market price should be based on sales similar in "availability to market." Shamrock essentially is in accord for there the representative price for the taxpayer's gas produced in the West Panhandle Field of Texas and the Texas portion of the Hugoton Field was computed on the basis of purchases of gas produced in the same two areas.[35]

The Hugoton Embayment consists of approximately 25 million acres. The contracts considered related to companies which were within thirty miles of the plaintiff's block. As reasons for using

---

33. This expert testified, however, that after he was hired he only spent twenty days putting his figures together.

34. Compare footnotes 3 and 27 supra.

35. It is interesting to note that before the Supreme Court in Cannelton the Government urged an industry-wide test. The Court, while not deciding this question, concentrated upon the lower court's findings of a substantial market for the tax-

payer's raw minerals in Indiana, the local region. The Court stated that "three-fifths of the fire clay produced in Indiana in 1951 was sold in its raw state," and that a "substantial market" for the taxpayer's raw material existed in Indiana. 364 U.S. at 86, 80 S.Ct. at 1586. The brief for the United States offered evidence of substantial sales all over the country as well as in Indiana. Brief for the United States, p. 4.

this limited area the Government's witness testified:

> Well, I felt that to get gas comparable to that of the taxpayer I should use gas in the same local geographical area and, also, the reservoirs from which this gas is produced are identical in all respects to that of the taxpayer.

As of this time there has been no attempt to define definitively the total area to be considered in computing a representative "market" or "field" price. We believe that such an all-inclusive rule cannot be laid down due to the fact that each case arises in its own particular context depending upon the surroundings in which the individual taxpayer finds himself. However, common sense dictates that when there are comparative sales within the immediate area practicalities should limit the weighted averages to their use. Not only is this conducive to an easier administration of the Regulation but further tends to equalize the taxpayer to his surroundings, i. e., the physical area in which his immediate competitors find themselves. Moreover, this method would be in accord with the general theory of Cannelton which tells us that in each of the three basic percentage depletion Acts, Congress indicated that integrated producers should not receive preferred treatment. "Consistent with that principle it would seem that * * * [in computing gross income] for the purpose of calculating percentage depletion allowance, one competitor ought not to receive preferred treatment over another similarly situated." Ames v. United States, 330 F.2d 770, 773 (9th Cir. 1964).[36]

But this does not mean that the weighted averages, as they now stand, are correct. Since 1949 there has been a minimum price order in effect in the State of Kansas. Originally set at 8 cents per Mcf, it was later superseded by an order effective January 1, 1954, increasing the minimum price to 11 cents per Mcf.[37] The validity of these orders as affecting *interstate* sales was certainly in doubt after the decision in Phillips Petroleum Co. v. State of Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954), and when, on April 11, 1955, the Supreme Court struck down a similar order in Natural Gas Pipeline Co. v. Panoma Corp., 349 U.S. 44, 75 S.Ct. 576, 99 L.Ed. 866 (1955), it was obvious that the Kansas order was also invalid. Formal invalidation came on January 20, 1958, twenty days after the close of the last year in suit, in a *per curiam* decision in Cities Service Gas Co. v. State Corp. Comm'n, 355 U.S. 391, 78 S.Ct. 381, 2 L.Ed.2d 355 (1958).

It can readily be assumed that each seller of gas at the wellhead in the Kansas Hugoton Field from 1954 through 1957 received, under claim of right, at least 11 cents per Mcf for its gas. Thereafter, however, many of the interstate pipeline companies buying gas from the field obtained refunds from sellers where the minimum price had been in excess of the contract price. Some refunds were made through settlements while others resulted in lawsuits. See, e. g., Cities Service Gas Co. v. Columbia Fuel Corp.,

---

36. The plaintiff argues that the Commissioner's findings relate to factors which influenced "the price that a seller of natural gas could command for his product in the Hugoton Embayment," see footnote 7 and accompanying text, supra, and therefore have no relevance to the weighted averages accepted as conclusive by the Commissioner since they were derived from the limited portion of the Hugoton Field previously described. We held in our first opinion that competition existed throughout the Embayment and that there was no reason "to believe that the sale price would differ because of a difference in location within the Embayment." 161 Ct.Cl. at 282, 315 F.2d at 872. Moreover, the tenor of plaintiff's argument is directed toward demonstrating that is operations were being conducted in a "depressed area" of the Hugoton Embayment. This line of reasoning leads to the inevitable conclusion that plaintiff is attempting to place himself above his immediate competitors. Our interpretation of Cannelton, of course, holds that this is not possible.

37. Both prices were on a pressure base of 14.65 p.s.i.a.

52 Del. 262, 155 A.2d 879 (1959). Our Commissioner took these refunds into account in computing the "net amount paid" from 1954 through 1957.[38] See footnote 10.

For tax purposes the income received by these producers during the years in question was gross income from the property and their percentage depletion deduction was computed at a rate of 27½ percent thereof. In like manner, the full sales proceeds would be reflected in gross income, and there is no evidence that either the amounts of gross income or the percentage depletion deductions claimed by these sellers for the earlier years were disturbed in the least by later refunds. Moreover, settled tax law is to the contrary for "[t]he 'claim of right' interpretation of the tax laws has long been used to give finality to that [accounting] period, and is now deeply rooted in the federal tax system." United States v. Lewis, 340 U.S. 590, 592, 71 S.Ct. 522, 523, 95 L.Ed. 560 (1951). See also North Am. Oil Consol. v. Burnet, 286 U.S. 417, 424, 52 S.Ct. 613, 76 L.Ed. 1197 (1932).

 And so it must be for the plaintiff. The income tax laws are administered on the basis of annual accounting periods and the tax is assessed on the basis of events happening in each such period. Burnet v. Sanford & Brooks Co., 282 U.S. 359, 51 S.Ct. 150, 75 L.Ed. 383 (1931). As stated in Healy v. Commissioner, 345 U.S. 278, 284–285, 73 S. Ct. 671, 675, 97 L.Ed. 1007 (1953):

> Congress has enacted an annual accounting system * * *. It would be disruptive of an orderly collection of the revenue to rule that the accounting must be done over again to reflect events occurring after the year for which the accounting is made, and would violate the spirit of the annual accounting system. *This basic principle cannot be changed simply because it is of advantage to a taxpayer or to the Government in a particular case that a different rule be followed.* (Emphasis added.)

We find no compelling reason on the facts of the instant case to vary from this long accepted tax rule.

The plaintiff, by confining its sales to intrastate business, is in a position to claim the benefits of the minimum price order. However, for purposes of depletion it cannot utilize the state price order as a lever in order to lift its depletion base above that of the ordinary non-integrated producer. To permit the plaintiff to take advantage of the order would perforce result in discrimination against its non-integrated competitors. And again, being directed to find the "constructive income" that the plaintiff would have received had it sold at the wellhead, we must necessarily reject any reference to the minimum price order since plaintiff was not entitled to its benefits until after its choice to integrate which resulted in its ability to make intrastate sales.

By deciding not to relate the refunds back to the tax years in question we may, for that limited period, be giving the plaintiff the benefit of the invalid price order. However, since the refunds appear to be reflected by reports to the FPC in the years subsequent to its invalidation the resulting weighted averages for these years will be lowered.

---

38. For sales made by the Western Natural Gas Company to Cities Service Gas Company, the Commissioner adopted the contract price (which was less than the actual amount paid pursuant to the Kansas price order) notwithstanding the fact that the lawsuit in which Cities Service seeks to recover additional amounts paid for the years 1954 through 1957 is still pending. See Western Natural Gas Co. v. Cities Service Gas Co., 201 A.2d 164 (Del.S.Ct.1964).

Ultimately one group of years will balance out of the other. We realize that the result may well not be a perfect $X$ equals $Y$ relationship due to the fact that the methods of reporting the refunds may vary from producer to producer. We are also aware of the following "problems" brought to our attention by Government counsel:

> [T]he producer making a refund may make no wellhead sales in the year of the refund, or the refund may be attributable to sales occurring in a number of years, or the integrated-operator such as the taxpayer here may be entitled to no depletion in the year of the refund.

For the most part we find such allegations unrealistic. Furthermore, their only effect will be to give an "advantage to * * * [the plaintiff] or to the Government" and the Healy quotation, supra, tells us that such a result is not enough to force a relation back.

We have examined all other contentions presented by the plaintiff and either find them to be without merit or fully decided by our first opinion. The case is hereby remanded back to the Commissioner for a recalculation of the weighted averages and for a calculation of the net amount plaintiff is entitled to recover.

## CONCLUSION OF LAW

Upon the foregoing opinion, which includes therein the findings of fact made by the court as a part of its judgment herein, the court concludes that this case should be, and it hereby is, remanded to the trial commissioner for further proceedings pertaining to recalculation of the weighted averages and for a calculation pursuant to Rule 47(c) (2) of the net amount plaintiff is entitled to recover.