**EXXON CORPORATION and Subsidiaries, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 96–688T.

United States Court of Federal Claims.

Jan. 7, 1998.

Robert L. Moore, II, Washington, DC, attorney of record for plaintiff.

George L. Squires, Washington, DC, with whom was Assistant Attorney General Loretta C. Argrett, for defendant.

## OPINION

REGINALD W. GIBSON, Senior Judge.

### INTRODUCTION

In this federal income tax refund case, plaintiff Exxon Corporation and its consolidated subsidiaries seek to recover the sum of $172,584,915.83, plus interest thereon as provided by law. Said amount represents Exxon's alleged overpayment of federal corporate income taxes in the amount of $57,704,527 and assessed interest in the amount of $114,880,388.83 for its taxable year ended December 31, 1975. At issue is Exxon's claimed entitlement to percentage depletion deductions, pursuant to Internal Revenue Code §§ 611, 613, and 613A,[1] relating to certain sales of natural gas during 1975.

Challenging Exxon's percentage depletion computations, defendant filed a motion for summary judgment pursuant to RCFC 56(b) on July 30, 1997 ("Def.MSJ"). Defendant postures the dispositive legal question as— whether Exxon, as a large integrated producer that sold natural gas pursuant to certain "fixed contracts" within the meaning of I.R.C. § 613A(b)(1)(B) during the taxable year 1975, is required to compute the amount of the percentage depletion deduction with respect to said gas sales by multiplying the applicable statutory percentage rate by the actual sale prices received under those contracts. Summary judgment may be granted only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Lane Bryant, Inc. v. United States*, 35 F.3d 1570, 1574 (Fed.Cir.1994). Here, the court is presented with a purely legal issue of statutory construction that is ripe for summary disposition, for the parties agree there is no genuine issue of material fact.[2] However,

---

1. Except as otherwise stated, section references herein are to the Internal Revenue Code of 1954 (the "Code"), Title 26 of the United States Code, as in effect for plaintiff's taxable year ended December 31, 1975. Jurisdiction is premised on § 6532(a) and § 7422(a) of the Code, and on 28 U.S.C. §§ 1346(a) and 1491.

2. *See* Plaintiff's Brief In Opposition To Defendant's Motion For Summary Judgment, filed August 22, 1997, at 1 ("Pl.Brf.").

after thorough consideration of the pertinent legal authorities and the submissions of the parties, we hold that defendant's motion for summary judgment must be denied.

## BACKGROUND

The litigants agree that, factually, the contested natural gas sales during Exxon's 1975 taxable year substantially mirror the 1974 natural gas sales which gave rise to the percentage depletion controversy in *Exxon Corp. v. United States,* 33 Fed.Cl. 250 (1995), *rev'd,* 88 F.3d 968 (Fed.Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 1252, 137 L.Ed.2d 332 (1997).[3] In both years, Exxon owned economic interests in hundreds of producing natural gas properties in east and south Texas. As a fully integrated producer of natural gas during 1974, as in 1975, Exxon was engaged in all phases of the natural gas business, including exploration, development, extraction, processing, transportation, and marketing. By way of comparison, a non-integrated producer typically sells "raw" natural gas in the immediate vicinity of the producing gas well, leaving it to other parties to process and transport the gas following the sale.[4]

From the 1950s through the early 1970s, Exxon entered into several long-term contracts for the sale and delivery of pipeline quality gas to various industrial users in the Texas intrastate market. Although these long-term contracts were entered into during a period of stable prices and contained price terms originally favorable to Exxon, at that time, market prices for natural gas rose briskly in the early 1970s. *See Commissioner v. Engle,* 464 U.S. 206, 211, 104 S.Ct. 597, 601, 78 L.Ed.2d 420 (1984); *Exxon,* 88 F.3d at 970 ("The market price of natural gas doubled in 1973, and doubled again in 1974."). Thus, by 1974 and 1975, prevailing market prices for natural gas significantly exceeded the prices at which Exxon was able to sell gas pursuant to its pre-existing long-term contracts.[5] This disparity in pricing lies at the core of the parties' dispute.

Turning to the applicable law, the parties vehemently disagree over the extent to which Exxon's percentage depletion computation for its 1975 taxable year is governed by the holding in *Exxon,* 88 F.3d 968, wherein the Federal Circuit prescribed the method by which Exxon's 1974 percentage depletion deduction had to be computed. This dispute is rooted in the enactment of the Tax Reduction Act of 1975, Pub.L. No. 94–12, 89 Stat. 26 ("the 1975 Act"), pursuant to which the Code's percentage depletion provisions relating to oil and gas production and the pertinent Treasury Regulations were substantially overhauled. In order to properly weigh the effect of this legislation on the case at bar, it is helpful to briefly review the law of percentage depletion before and after the enactment of the Act.

---

3. *See* Pl. Brf. at 2 ("The basic dispute here [for the 1975 tax year] has already been litigated by these parties in connection with Exxon's 1974 tax year."); Def. MSJ at 4 (assertion that "many facts are common to both cases"); Defendant's Proposed Findings Of Uncontroverted Fact, filed July 30, 1997, at 1, n. 1 ("Def.PFF"). Citations herein to the Court of Federal Claims' decision regarding the computation of Exxon's percentage depletion deduction for the 1974 taxable year, 33 Fed.Cl. 250, shall be to findings of fact not reversed on appeal.

4. *See* Def. PFF at 4, ¶ 9; Pl. Issue at 2, ¶ 9; *Exxon,* 88 F.3d at 970, 33 Fed.Cl. at 252. Lacking a fully developed evidentiary record with respect to Exxon's 1975 taxable year, the court finds it imprudent to extensively discuss the technology and methods by which Exxon produced, processed, and transported natural gas. Moreover, the competitive structure and dynamics of the natural gas market in which Exxon conducted business in 1975 are not a matter of record.

Notwithstanding the foregoing, an exacting inquiry into such *factual matters is unnecessary to* the disposition of the question of statutory construction presently before the court. In any event, as to 1974, these matters were ably explicated in *Exxon,* 33 Fed.Cl. at 256–62.

5. In 1974, the average delivery price of gas committed under Exxon's long-term contracts was $0.23 per thousand cubic feet (Mcf), and the pertinent weighted average market price was ultimately determined to be $0.39/Mcf. *Exxon,* 88 F.3d at 970, 976, 979. In the present case, Exxon's claim is premised upon a continuation of the upward trend in market prices for natural gas, since Exxon asserts that the weighted average market price during 1975 was $0.77/Mcf. As discussed herein at greater length, *infra,* the Treasury Regulations *implementing the depletion* provisions of the Code refer to this weighted average market price as the "representative market or field price." Treas.Reg. § 1.613–3(a).

### 1. *Pre–1975 Percentage Depletion*

In 1974, as well as in 1975, the basic Code provision authorizing natural gas depletion deductions stated, in relevant part:

> In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate.

I.R.C. § 611(a). Depletion reflects the exhaustion of a natural resource, such as natural gas, as a result of its severance from the earth. *Exxon*, 33 Fed.Cl. at 252. Explaining the operative characteristics of the statutory depletion allowance, the Supreme Court observed:

> Congress has allowed holders of economic interests in mineral deposits, including oil and gas wells, to deduct from their taxable incomes the larger of two depletion allowances: cost or percentage. Under cost depletion, taxpayers amortize the cost of their wells over their total productive lives. Under percentage depletion, taxpayers deduct a statutorily specified percentage of the "gross income" generated from the property, irrespective of actual costs incurred.

*Engle*, 464 U.S. at 208–09, 104 S.Ct. at 600 (citations omitted). Here at bar, cost depletion is not at issue. However, the nature and purpose of the percentage depletion allowance is most easily understood by way of comparison to cost depletion. Over the productive life of a natural gas property, cost depletion deductions recover, and are limited to, the amount of the owner's investment in the property. In other words, cost depletion "returns to the owner or extractor of the resources his capital investment pro rata over the resources' productive life." *Exxon*, 33 Fed.Cl. at 252.[6]

Percentage depletion, on the other hand, is not based upon the taxpayer's investment in the property, but rather, upon the income generated by the property. Effective for taxable years ending on or before December 31, 1974, § 613 of the Code provided, *inter alia:*

> (a) General Rule.—In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of *the gross income from the property . . . .*
>
> (b) Percentage Depletion Rates.—The mines, wells, and other natural deposits, and the percentages, referred to in subsection (a) are as follows:
>
> (1) *22 percent*—
>
> (A) *oil and gas wells* [.]

§§ 613(a), (b)(1)(A) (1974) (emphasis added). In short, prior to 1975 the annual allowance for percentage depletion equalled 22 percent of the gross income from sales of natural gas extracted from the property, subject to certain limitations not pertinent here,[7] irrespective of the taxpayer's investment in the property. Thus, unlike cost depletion, percentage depletion yields a stream of annual deductions which, over the productive life of the natural gas property, may exceed the taxpayer's investment in the property. Naturally, "[t]axpayers have historically preferred the allowance for percentage, as opposed to cost,

---

6. Cost depletion is analogous to the depreciation allowance with respect to property, plant and equipment used in a trade or business. *See generally* § 167. Whereas depreciation deductions generally recover an asset's cost ratably over the useful life of the property, cost depletion is computed on a units-of-production basis. "The annual cost depletion deduction generally is calculated by multiplying the cost of the mineral interest by the ratio of the units sold in a taxable year to the total estimated recoverable reserves." *Engle*, 464 U.S. at 209 n. 2, 104 S.Ct. at 600 n. 2 (citing Treas.Reg. § 1.611–2(a)).

7. For example, "the gross income from the property" excludes "an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property." § 613(a). Moreover, the allowance for percentage depletion "shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion)." *Id.* Neither of these constraints on "the gross income from the property" is contested here.

depletion on wells that are good producers because the tax benefits are significantly greater." *Engle*, 464 U.S. at 209, 104 S.Ct. at 600. Because the taxpayer is entitled to an income tax deduction without a corresponding economic outlay, it is universally acknowledged that Congress intended the allowance for percentage depletion to serve as an economic incentive that "would encourage 'extensive exploration and increasing discoveries of additional [natural gas deposits] to the benefit of the economy and strength of the Nation.'" *Exxon*, 33 Fed.Cl. at 252–53 (quoting *United States v. Cannelton Sewer Pipe Co.*, 364 U.S. 76, 81, 80 S.Ct. 1581, 1584, 4 L.Ed.2d 1581 (1960)). *See also Engle*, 464 U.S. at 208–09, 104 S.Ct. at 599–600; *Exxon Corp. v. Commissioner*, 102 T.C. 721, 730–34, 1994 WL 243435 (1994) (addressing the same percentage depletion issue presented here, but with respect to Exxon's 1979 taxable year).

While the allowance for percentage depletion undeniably operates as a subsidy to natural gas producers, the litigation over Exxon's 1974 percentage depletion computation centered upon the extent of Congress' largesse. The focal point of the parties' dispute was a Treasury Regulation that provides, in relevant part:

> In the case of oil and gas wells, "gross income from the property," as used in section 613(c)(1), means the amount for which the taxpayer sells the oil or gas in the immediate vicinity of the well. If the oil or gas is not sold on the premises but is manufactured or converted to a refined product prior to sale, or is transported from the premises prior to sale, the gross income from the property shall be assumed to be equivalent to the *representative market or field price* of the oil or gas before conversion or transportation.

Treas.Reg. § 1.613–3(a) (emphasis added). The "representative market or field price" (RMFP) computation is intended to foster parity with respect to the depletion deduction between integrated and nonintegrated producers of natural gas. All things being equal, integrated producers tend to sell natural gas at prices higher than those charged by nonintegrated producers and, concomi-

tantly, integrated producers realize more gross income per unit of natural gas sold. This price differential arises because integrated producers frequently transport and process gas after extraction and prior to sale, whereas nonintegrated producers commonly sell unprocessed gas near the wellhead. *Exxon*, 88 F.3d at 970, 33 Fed.Cl. at 252.

Treas.Reg. § 1.613–3(a) is designed to maintain integrated and nonintegrated producers on an equal competitive footing, by requiring that the integrated producer's "gross income from the property" exclude post-extraction value added to the natural gas. *Exxon*, 88 F.3d at 975–76 (citing *Panhandle Eastern Pipe Line Co. v. United States*, 187 Ct.Cl. 129, 408 F.2d 690, 700 (1969); *Hugoton Production Co. v. United States*, 161 Ct.Cl. 274, 315 F.2d 868, 869 (1963) ("*Hugoton I*")). Thus, the RMFP calculation aims to ensure that an integrated producer is entitled to no greater percentage depletion deduction, for any given quantity of natural gas extracted, than its nonintegrated competitors. *Exxon*, 88 F.3d at 975 (citing *Hugoton Production Co. v. United States*, 172 Ct.Cl. 444, 349 F.2d 418, 425 (1965) ("*Hugoton II*")). It logically follows that "the fundamental goal of the [RMFP] calculation is to arrive at a price that is representative of the price which would be realized by nonintegrated producers." *Id.* at 976 (emphasis in original omitted). Stated differently, the RMFP calculation yields "a *constructive* gross income" on which the integrated producer's percentage depletion deduction is based. *Id.* at 970 (emphasis added). This constructive gross income, *i.e.*, the RMFP, is "calculated as the weighted average price of wellhead sales of comparable gas in the taxpayer's market area." *Id.* at 976 (citing *Panhandle*, 408 F.2d at 703; *Hugoton I*, 315 F.2d at 877.)

In their litigation over Exxon's 1974 percentage depletion computation, the parties contested the manner in which the RMFP calculation should apply to Exxon's natural gas sales. The Government contended "that the statutes and regulations preclude, as a matter of law, the use of an RMFP that exceeds the taxpayer's actual gross income." *Id.* at 972. Conversely, Exxon maintained that the RMFP calculation, faithfully applied,

is dispositive "regardless of . . . whether the RMFP greatly exceeds or falls far below [the] taxpayer's actual income." *Exxon*, 33 Fed.Cl. at 265. In sustaining Exxon's position and repudiating the Government's argument, the Federal Circuit held that "neither prior case law, nor the language of the statute, nor its legislative history limits an otherwise valid RMFP to actual gross income." *Exxon*, 88 F.3d at 976.[8] Therefore, Exxon was entitled to base its percentage depletion deductions on an RMFP of $0.39/Mcf, notwithstanding the fact that the actual price of gas sold by Exxon pursuant to its long-term contracts averaged but $0.23/Mcf. *Id.* at 970, 979. In essence, the Federal Circuit's holding maintained the parity with respect to the depletion deduction between integrated and nonintegrated gas producers, even in circumstances wherein the former is locked into long-term contracts and the market value of natural gas has risen substantially.

### 2. *Post–1974 Percentage Depletion*

Historically, as previously discussed, *supra*, the allowance for percentage depletion had been viewed as a necessary incentive to domestic oil and gas production. By early 1975, however, Congress grew convinced that this tax incentive had outlived its usefulness, at least so far as the major integrated oil and gas companies were concerned. As to the factors which fueled this shift in energy and tax policy, the Supreme Court has explained:

> The 1970s . . . brought about an abrupt redirection in the nation's energy policy. Escalating energy prices and the Arab oil embargo awakened the public to the nation's growing reliance on foreign energy sources. Some thought the major integrated oil companies were reaping excessive oil and gas profits at the public's expense, while reinvesting little of their concomitant tax depletion subsidies in domestic energy production. Congress responded to the public outcry by repealing the percentage allowance as applied to the major integrated oil companies.

*Engle*, 464 U.S. at 211, 104 S.Ct. at 601 (citing, *inter alia*, the Tax Reduction Act of 1975, Pub.L. No. 94–12, § 501, 89 Stat. 26, 47–53 (March 29, 1975)). Effective January 1, 1975, with application to taxable years ending after December 31, 1974,[9] newly enacted I.R.C. § 613A provided:

> SEC. 613A. LIMITATIONS ON PERCENTAGE DEPLETION FOR OIL AND GAS.
>
> (a) GENERAL RULE.—*Except as otherwise provided in this section*, the allowance for depletion under section 611 with respect to any oil or gas well shall be computed without regard to section 613.
>
> (b) EXEMPTION FOR CERTAIN DOMESTIC GAS WELLS.—
>
> > (1) IN GENERAL.—The allowance for depletion under section 611 *shall be computed in accordance with section 613* with respect to—
> >
> > . . . .
> >
> > (B) *natural gas sold under a fixed contract* . . . .
> >
> > . . . .
>
> and 22 percent shall be deemed to be specified in subsection (b) of section 613 for purposes of subsection (a) of that section.

I.R.C. §§ 613(a), (b) (1975) (emphasis added). The 1975 Act also made several correlative technical amendments to § 613 of the Code, two of which are relevant here. First, § 613(d) was amended to state: "Except as provided in section 613A, in the case of any oil or gas well, the allowance for percentage depletion shall be computed without reference to this section." Pub.L. No. 94–12, § 501(b), 89 Stat. 53. Second, the 1975 Act

---

**8.** The Federal Circuit reasoned that "the RMFP is employed as an inexact, simplified means of calculating an integrated producer's depletion deduction." *Exxon*, 88 F.3d at 976. Although the Federal Circuit had a great deal more to say about certain features of the RMFP calculation, these matters are irrelevant to the court's resolution of the dispositive question of law presented by defendant's pending motion for summary judgment. Even if assumed relevant, the computational particulars of the RMFP implicate genuine issues of material fact which would preclude summary judgment pursuant to RCFC 56(c).

**9.** *See* Pub.L. No. 94–12, § 501(c), 89 Stat. 53. Inasmuch as Exxon filed its 1975 tax return based on the calendar year, the amendments made by the 1975 Act apply here at bar.

struck out former § 613(b)(1)(A), which made reference to "oil and gas wells" as mineral properties the production from which qualified for percentage depletion at a rate of 22 percent. *Id.*

Of pertinence to the case at bar, § 613A(b)(1)(B) *excepted* certain "natural gas sold under a fixed contract" from the repeal of percentage depletion, defined as follows:

The term "natural gas sold under a fixed contract" means domestic natural gas sold by the producer under a contract, in effect on February 1, 1975, and at all times thereafter before each sale, under which the price for such gas cannot be adjusted to reflect to any extent the increase in liabilities of the seller for tax under this chapter by reason of the repeal of percentage depletion. Price increases after February 1, 1975, shall be presumed to take increases in tax liabilities into account unless the taxpayer demonstrates to the contrary by clear and convincing evidence.

§ 613A(b)(2)(A). Solely for purposes of its motion for summary judgment, defendant concedes that natural gas sold by Exxon pursuant to its long-term contracts during 1975 constituted "natural gas sold under a fixed contract" within the meaning of § 613A(b)(1)(B). Def. MSJ at 3 n. 1, 9, 11.[10]

There is no meaningful legislative history relating to the fixed contract exception to the repeal of percentage depletion, because this exception was given no consideration in legislative committee proceedings, and engendered no floor debate in either House of Congress.[11] However, the obvious import of the fixed contract exception is that integrated natural gas producers were precluded from reaping windfall profits by virtue of the rapid escalation of gas prices in the 1970s to the extent that said producers were contractually locked into fixed, below-market selling prices for their gas. Because integrated producers selling natural gas pursuant to fixed contracts were unable to finance increased gas production by reaping enhanced profits in the marketplace, Congress maintained the percentage depletion subsidy for gas sales under fixed contracts. *See Exxon,* 102 T.C. at 734 ("The fixed contract exception to the repeal of percentage depletion ... assumed that sellers of natural gas under fixed contracts could not obtain the benefits of higher prices and thus were also entitled to contin-

---

10. Defendant reserves its right to hold Exxon to its burden of proof at trial on this issue. *Id.* Even so, defendant concedes in its pretrial submissions that 16 of the 18 long-term contracts at issue are "fixed contracts" within the meaning of § 613A(b)(1)(B). Defendant's Memorandum Of Contentions Of Fact And Law, filed September 26, 1997, at 2.

11. *See* Transcript, Hearings Before the House Committee on Ways and Means, 94th Cong., 1st Sess. (January 22–30, 1975); H.R.Rep. No. 19, 94th Cong., 1st Sess. (February 25, 1975); 121 Cong. Rec. 4593–4658 (February 27, 1975) (House floor debates); Transcript, Hearings Before the Subcommittee on Energy, Senate Committee on Finance, on H.R. 2166, Tax Reduction Act of 1975, 94th Cong., 1st Sess. (March 17, 1975); S.Rep. No.36, 94th Cong., 1st Sess. (March 17, 1975); 121 Cong. Rec. 7218, 7228–32, 7238–42, 7263–69, 7285–7306, 7480–7511, 7743, 7745, 7749–7823, 7881–82, 7984, 7987–8133 (March 18–21, 1975) (Senate floor debates); H.Conf.Rep. No. 120, 94th Cong., 1st Sess. (March 26,1975).

Commenting on "the poverty of § 613A's legislative history as a source for the Court's conclusion," Justice Blackmun explained:

Section 613A is a relatively minor portion of the Tax Reduction Act of 1975.... The princi-

pal purpose of the Act was to provide a tax cut to counteract the effects of the then-current recession. Because of the perceived need for an immediate tax stimulus, the Act proceeded through Congress with unusual speed. The amendments that became § 613A were introduced on the floor of both Houses of Congress rather than during committee proceedings, and the time devoted to their consideration and debate was severely limited.

*Engle,* 464 U.S. at 233 & n. 2, 104 S.Ct. at 612 & n. 2 (Blackmun, J., dissenting) (citation omitted). *See* 121 Cong. Rec. 4503–04 (February 25, 1975) (introduction of percentage depletion repeal via floor amendments). The unusual, accelerated manner by which the amendments enacting § 613A were introduced and considered fueled many procedural objections on the House floor. *See* 121 Cong. Rec. 4594 (Rep. Quillen), 4594–95 (Rep. Anderson), 4595 (Rep. Cederberg), 4597 (Reps. Frenzel, du Pont), 4602–03 (Rep. Schneebeli), 4604–05 (Rep. Clancy), 4609 (Rep. Shriver), 4621 (Rep. Waggonner). *Even certain* members of the House who favored the repeal of percentage depletion openly indicated their opposition to the § 613A amendments on solely procedural grounds. *Id.* at 4595 (Rep. Anderson), 4597 (Rep. du Pont), 4603 (Rep. Schneebeli), 4605 (Rep. Clancy), 4606 (Rep. Rhodes), 4609 (Rep. Frenzel).

ued use of percentage depletion at the 22 percent rate."). It further stands to reason that long-term fixed contracts predating the 1975 Act contained price terms premised upon the percentage depletion subsidy, and that an abrupt termination of the allowance for percentage depletion would dislocate the economics of continued gas production pursuant to such contracts. Support for this conclusion is found in the statutory definition of "natural gas sold under a fixed contract," which hinges upon the integrated producer's inability to adjust its gas prices upward in order to take the repeal of percentage depletion into account. § 613A(b)(2)(A).[12] Thus, an integrated producer unable to turn to the rising gas market of the 1970s as a source of needed funds could, under the post–1974 fixed contract exception, continue to look to the percentage depletion subsidy for increased development and production of natural gas.

Administrative implementation of the repeal of percentage depletion, and the fixed contract exception thereto, was effected by the promulgation of Treasury Regulations under § 613A in 1977. T.D. 7487, 42 Fed. Reg. 24,264 (May 13, 1977); Treas.Reg. §§ 1.613A–1, 1.613A–2(a), 1.613A–2(d), 1.613A–7(d). Treas.Reg. § 1.613–3(a), prescribing the RMFP as the base upon which integrated natural gas producers compute their allowance for percentage depletion, was retained unaltered in the Code of Federal Regulations. From this circumstance arises the controversy here at bar.

## CONTENTIONS OF THE PARTIES

### 1. *Defendant*

Defendant contends that the 1975 Act "virtually upended the percentage depletion rules by 180 degrees," and thereby breathed new life into the argument rejected by the Federal Circuit with respect to Exxon's 1974 taxable year—specifically, that Exxon is precluded, as a matter of law, from calculating percentage depletion by reference to an RMFP calculated pursuant to Treas.Reg. § 1.613–3(a), as opposed to Exxon's actual gross income from the pertinent sales of natural gas. *See Exxon*, 88 F.3d at 972. However, defendant's rejuvenated argument stands on different reasoning. Concerning Exxon's 1974 taxable year, defendant argued, in essence, that Treas.Reg. § 1.613–3(a) must be read to establish the actual gross income from natural gas sales as "a cap on the RMFP" or, in the alternative, "that the regulation as written is invalid whenever an RMFP exceeds the [actual] sales price." *Exxon*, 33 Fed.Cl. at 266; *see also* 88 F.3d at 974. Thus, as to pre–1975 taxable years, defendant's position was that integrated gas producers were required to compute percentage depletion based upon the lesser of actual gross income or the RMFP.

In stark contrast to its pre–1975 position, defendant now maintains that Treas.Reg. § 1.613–3(a) *never* applies when an integrated producer computes its percentage depletion allowance for post–1974 taxable years in accordance with the § 613A(b)(1)(B) fixed contract exception. Defendant submits that

---

12. This view finds some additional support in the deliberations in the preceding Congress over H.R. 14462, the Oil and Gas Energy Tax Act of 1974, which provided for a three-step phaseout of percentage depletion. *See* H.R.Rep. No. 1028, 93d Cong., 2d Sess. 35, 41–44 (May 4, 1974). Although this proposal was not enacted into law, the report of the House Ways and Means Committee stated, in relevant part, that:

> The second exemption from the phaseout [of percentage depletion] applies to gas sold in intrastate commerce under a fixed contract which does not permit adjustments in the price to reflect the producer's increased cost arising from the reduction in the depletion allowance. In such cases, when the contract was in effect at the time your committee decided to phase our depletion on natural gas (April 10, 1974), *the producer is frozen into what may be a finan-*

*cially restrictive situation. . . .* Where fixed price contracts exist, your committee believes that it would be unfair to apply the phaseout of depletion while the contract is in effect, and therefore the bill exempts gas sold in intrastate commerce under such a contract.

*Id.* at 44 (emphasis added). However, the court is constrained to observe that deliberations over the proposed but unenacted repeal of percentage depletion, and exceptions thereto, in the 93d Congress provide limited guidance concerning the intention of the 94th Congress as expressed in the 1975 Act. *See Engle*, 464 U.S. at 222–23, 104 S.Ct. at 607–08 (rejecting invitation to interpret § 613A(c) independent producer and royalty owner exception to percentage depletion repeal by reference to deliberations over similar proposed legislation in the 93d Congress).

Congress, by enacting § 613A into law, "pegg[ed] the allowance for percentage depletion for fixed contract gas ... to the *actual sales prices in effect on February 1, 1975.*" Def. MSJ at 23 (emphasis in original). Moreover, avers defendant, "even if the actual sales of natural gas are made after the gas has been converted into a refined product (as in this case), the prices received on those sales (as fixed by the long-term contracts in effect on February 1, 1975) determine the percentage depletion allowance." *Id.* at 24.[13]

In support of its contention, defendant relies mainly upon statements in the legislative history of the 1975 Act that demonstrate Congress' general antipathy toward the large percentage depletion allowances being claimed by the major integrated oil and gas companies in the face of perceptions that these firms were simultaneously reaping windfall profits as a result of rapidly escalating oil and gas prices in the 1970s.[14] Defendant readily concedes that § 613A(b)(1) provides "that the percentage depletion allowance with respect to qualifying gas is to be computed 'in accordance with section 613.'" Defendant's Reply Brief, filed October 24, 1997, at 3 ("Def.Reply"). Yet, because § 613A and the legislative history of the 1975 Act make no express reference to Treas.Reg. § 1.613–3(a), defendant reasons that Congress did not affirmatively intend that the RMFP *method* would govern the computation of percentage depletion pursuant to the fixed contract exception. Instead, defendant urges, Congress merely intended that the 22 percent depletion *rate* would continue to apply to post–1974 sales of natural gas pursuant to fixed contracts. Defendant also reminds the court that the fixed contract exception to § 613A(b)(1)(B), as with any other Code provision authorizing an income tax deduction, is a matter of legislative grace and must be narrowly construed.

Lastly, defendant asserts that *Exxon,* 88 F.3d 968, concerning pre–1975 percentage depletion, is wholly inapposite to percentage depletion allowances under the post–1974 fixed contract exception. Defendant relies on the Federal Circuit's observation that the stated objective of Treas.Reg. § 1.613–3(a) is the exclusion of value added by "downstream processing" from the gross income on which percentage depletion is based, rather than value created by "changes in market conditions," *i.e.,* sharply rising natural gas prices. *Exxon,* 88 F.3d at 976. It naturally follows that the RMFP is inapplicable to percentage depletion computations under the post–1974 fixed contract exception, according to defendant, because Congress enacted the 1975 Act in response to those very same "changes in market conditions." By way of illustration, defendant directs the court's attention to *Exxon,* 102 T.C. 721, wherein the Tax Court sustained defendant's position with regard to Exxon's percentage depletion allowance for the 1979 taxable year. Because, as in the present case, Exxon's RMFP exceeded the actual sales price of the natural gas in question, the Tax Court reasoned that the effect of the RMFP was the creation of "phantom

---

**13.** Defendant does not, however, go so far as to contend that the 1975 Act rendered Treas.Reg. § 1.613–3(a) invalid in every instance. Somewhat remarkably, defendant suggests that the RMFP continues to govern the calculation of percentage depletion allowable to certain *non*-integrated natural gas producers and royalty owners in *post*–1974 taxable years.

In contrast, the basic rules have remained the same with respect to independent producers and royalty owners, under § 613A(c), which does *not* tie the depletion computation to sale prices in effect as of February 1, 1975. If, after 1974, a small, independent oil or gas producer were to process, manufacture, or convert raw natural gas into a refined product (such as residue gas) or to transport beyond the immediate vicinity of the well raw natural gas it produced prior to selling it, § 613A

permits percentage depletion, limited in volume, but based on "representative market or field price" pursuant to Treas.Reg. § 1.613–3(a).

Def. MSJ at 24 n. 22 (emphasis in original) (citing Rev. Rul. 90–62, 1990–2 C.B. 158).

**14.** *See* Transcript, Hearings Before the Subcommittee on Energy, Senate Committee on Finance, on H.R. 2166, 94th Cong., 1st Sess. 123 (1975) (joint statement by Senators Kennedy and Hollings, citing study indicating that net income of major integrated oil companies was taxed at a rate of but 6.5 percent in 1973); 121 Cong. Rec. 7240–42 (1975); *Engle,* 464 U.S. at 218 n. 16, 104 S.Ct. at 605 n. 16 (citing 121 Cong. Rec. at 4610 (1975)).

income" never received by Exxon nor included in its gross income for tax purposes. *Id.* at 737. Concerned that the resultant inflation of Exxon's percentage depletion allowance conflicted irreconcilably with the assumptions behind the post–1974 fixed contract exception to the repeal of percentage depletion, the Tax Court concluded that Exxon's RMFP, if sustained, "would frustrate the purpose of section 613A." *Exxon*, 102 T.C. at 735.[15]

### 2. *Plaintiff*

Characterizing defendant's construction of the 1975 Act as wishful thinking, Exxon emphasizes, as it did in the litigation over its 1974 percentage depletion allowance, the literal language of the Code and the Treasury Regulations thereunder. Exxon pointedly notes that where the fixed contract exception applies, as in the present case, the Code states unequivocally that the allowance for percentage depletion "shall be computed in accordance with section 613." § 613A(b)(1). Where § 613 applies, reasons Exxon, the

pre–1975 law of percentage depletion must likewise continue to apply unless Congress stipulated otherwise in the 1975 Act.[16] From the absence of any language hostile to Treas. Reg. § 1.613–3(a) in the 1975 Act and its legislative history, not to mention the sheer paucity of legislative history concerning the fixed contract exception generally, Exxon deduces that Treas.Reg. § 1.613–3(a) remains fully in effect for post–1974 taxable years. Finally, to bring this exercise in interpretive literalism to its desired conclusion, Exxon reiterates its contention, already found persuasive by the Federal Circuit with regard to pre–1975 taxable years, that the plain language of Treas.Reg. § 1.613–3(a) "requires the use of an RMFP whenever, as is the case here, the natural gas has been processed and transported away from the premises prior to sale." *Exxon*, 88 F.3d at 974.

Exxon's lesser contentions need not be addressed, nor must the court decide whether Exxon is entitled to apply Treas.Reg. § 1.613–3(a) in unconstrained fashion to com-

---

**15.** At oral argument, defendant raised yet another contention centering upon the two basic classes of natural gas products which can be processed from a wellstream of raw gas: (i) pipeline quality gas, which is almost entirely methane; and (ii) natural gas liquids, which include ethane, pentene, propane, butane, etc. According to defendant, Exxon sold only pipeline quality gas, not natural gas liquids, pursuant to fixed contracts during 1975. Defendant complains that Exxon improperly seeks to use an RMFP based upon the value *of the entire wellstream*, despite the fact that only pipeline quality gas was sold pursuant to fixed contracts.

The gravamen of defendant's contention is that if natural gas liquids have a different wellhead value per Mcf than pipeline quality gas, then an RMFP computed upon the value of the full wellstream distorts the "gross income from the property" with regard to the pipeline quality gas that is sold pursuant to fixed contracts. However, as defendant inadvertently conceded at oral argument, the relative valuation of Exxon's pipeline quality gas and natural gas liquids presents a genuine issue of material fact unsuitable for summary disposition. *See* Transcript, Hearing of December 18, 1997, at 60.

**16.** Exxon cites several cases in support of the self-evident but "fundamental truth that section 613 retains vitality for post–1974 years." Pl. Brf. at 7. *See Engle*, 464 U.S. at 214, 104 S.Ct. at 603 ("The 1975 amendments to the Code did not repeal any of the provisions that previously entitled taxpayers to an allowance for percentage

depletion on lease bonus or advance royalty income arising from oil and gas mineral interests."); *id.* at 227, 104 S.Ct. at 609–10 (holding that independent producers and royalty owners remained entitled to percentage depletion on lease bonus or advance royalty income, as under pre–1975 law); *Engle v. Commissioner*, 677 F.2d 594, 595 n. 4 (7th Cir.1982) ("[T]he prior statutory scheme is relevant to the extent that the current statutory language fails to evidence a clear intent on the part of Congress to effect a different result under the Tax Reduction Act of 1975."), *aff'd*, 464 U.S. 206, 104 S.Ct. 597, 78 L.Ed.2d 420 (1984); *Louisiana Land and Exploration Co. v. Commissioner*, 90 T.C. 630, 640, 1988 WL 29747 (1988) ("[T]he rules of section 613A work on the foundation of section 613 ..."); *Farmar v. United States*, 689 F.2d 1017, 1022, 231 Ct.Cl. 642 (1982) ("Congress retained the old § 613 ... [and] § 613A simply add[s] a further screen for the percentage depletion deductions ... Both provisions ... play their separate roles, but in conjunction with each other."), *rev'd on unrelated grounds*, 464 U.S. 206, 104 S.Ct. 597, 78 L.Ed.2d 420 (1984) (companion case to *Engle* ).

The court is mindful, however, that the precedents cited by Exxon dealt with neither the fixed contract exception of § 613A(b)(1)(B) nor Treas. Reg. § 1.613–3(a). Exxon's brief conveniently omits reference to the sole precedent, decided adversely to Exxon, addressing the post–1975 interplay of these two provisions. *See Exxon*, 102 T.C. 721.

pute its 1975 percentage depletion allowance under the fixed contract exception. Given the procedural posture of this case, it suffices to say that the court agrees with Exxon that defendant's position rests exclusively upon the legislative history of § 613A, which simply does not speak to the question at hand, and upon tax policy considerations, all at the expense of the plain language of the Code. This shortcoming compels the conclusion that defendant is not entitled to judgment as a matter of law.

## DISCUSSION

Defendant's position can be sustained as a matter of law on but two alternate grounds. First, the court might narrowly hold that Treas.Reg. § 1.613–3(a) is, on the facts of this case, inapplicable to Exxon's computation of percentage depletion pursuant to the fixed contract exception for its 1975 taxable year. Second, the court might broadly hold that the 1975 Act implicitly invalidated Treas.Reg. § 1.613–3(a) in every case to which the fixed contract exception applies. For the reasons set forth herein, *infra,* summary disposition of this case in defendant's favor on either of the aforesaid grounds is inappropriate.

At the outset, the court observes that the Code and pertinent Treasury Regulations unambiguously direct an integrated natural gas producer to Treas.Reg. § 1.613–3(a) for guidance as to the manner in which its percentage depletion allowance must be computed in post–1974 taxable years. It is undisputed, for purposes of defendant's summary judgment motion, that Exxon's sales of natural gas during 1975 pursuant to the long-term fixed contracts in question qualify for percentage depletion under the fixed contract exception of § 613A(b)(1)(B). Moreover, § 613A(b)(1) commands with unmistakable clarity that the allowance for percentage depletion under the fixed contract exception "shall be computed in accordance with section 613." Inasmuch as § 613(a) provides that percentage depletion is to be computed

upon "the gross income from the property," the reader is inexorably led to Treas.Reg. § 1.613–3(a), which defines that term in the context of oil and gas wells qualifying for percentage depletion.[17] We turn now to the analytical framework by which the post–1974 validity of Treas.Reg. § 1.613–3(a) must be evaluated.

A wealth of case law firmly establishes that courts "must defer to Treasury Regulations that 'implement the congressional mandate in some reasonable manner.' " *Commissioner v. Portland Cement Co. of Utah,* 450 U.S. 156, 169, 101 S.Ct. 1037, 1045, 67 L.Ed.2d 140 (1981) (quoting *United States v. Correll,* 389 U.S. 299, 307, 88 S.Ct. 445, 450, 19 L.Ed.2d 537 (1967)). *See also Rowan Companies, Inc. v. United States,* 452 U.S. 247, 252, 101 S.Ct. 2288, 2292, 68 L.Ed.2d 814 (1981); *National Muffler Dealers Assn. v. United States,* 440 U.S. 472, 476–77, 99 S.Ct. 1304, 1306–07, 59 L.Ed.2d 519 (1979). Further delineating the nature of the inquiry, the Supreme Court has declared that "[t]he framework for analysis is refined by consideration of the source of the authority to promulgate the regulation at issue." *United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 24, 102 S.Ct. 821, 827, 70 L.Ed.2d 792 (1982). *See also Schuler Industries, Inc. v. United States,* 109 F.3d 753, 754–55 (Fed.Cir.1997) (standard of review determined by reference to Code provision pursuant to which regulation is promulgated) (citations omitted). Thus, when the Commissioner issues a so-called "interpretive" Treasury Regulation in the exercise of his general authority to "prescribe all needful rules and regulations" pursuant to § 7805(a), the reviewing court "measure[s] the Commissioner's interpretation against a specific provision of the Code [and] owe[s] the interpretation less deference than a regulation issued under a specific grant of authority to define a statutory term or prescribe a method of executing a statutory provision." *Rowan Cos.,* 452 U.S. at 253, 101 S.Ct. at 2292 (citing *Portland Cement,* 450

---

17. Lest there be any doubt concerning the pertinence of Treas.Reg. § 1.613–3(a), the court takes pain to note that, so far as oil and gas wells are concerned, the term "gross income from the property" is nowhere else defined in the Code or Treasury Regulations. *See* § 613(c) (defining generally the term "gross income from the property" for percentage depletion purposes, but specifically excluding oil and gas wells).

U.S. at 165, 101 S.Ct. at 1043–44; *Fulman v. United States,* 434 U.S. 528, 533, 98 S.Ct. 841, 845, 55 L.Ed.2d 1 (1978); *Batterton v. Francis,* 432 U.S. 416, 424–25 & nn. 8–9, 97 S.Ct. 2399, 2405 & nn. 8–9, 53 L.Ed.2d 448 (1977)).[18]

■ Conversely, as the Tax Court has stated, Treas.Reg. § 1.613–3(a) "is *legislative in nature,* and the rules of interpretation applicable to statutes should be used in determining the meaning of legislative regulations." *Exxon,* 102 T.C. at 727 (addressing same issue presented here, but with regard to Exxon's 1979 taxable year) (emphasis added) (citations omitted). Treas.Reg. § 1.613–3(a) derives its legislative character from the Code's directive that the depletion allowance is "*in all cases* to be made under regulations prescribed by the Secretary." § 611(a) (emphasis added). Therefore, because Treas. Reg. § 1.613–3(a) "is promulgated pursuant to a specific statutory authority, it is a substantive rule, legislative in character." *Exxon,* 102 T.C. at 727 n. 9 (citing *Wing v. Commissioner,* 81 T.C. 17, 28, 1983 WL 14849 (1983)). *See also Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984) (administrative regulation is "legislative" when issued pursuant to an express statutory delegation of rulemaking authority to the issuing agency); *Schuler,* 109 F.3d at 755 ("[A] legislative regulation rooted in a grant of power by Congress ... is given legislative effect.").

The legislative character of Treas.Reg. § 1.613–3(a), which defines the term "gross income from the property" in the case of oil and gas wells, is incontestably demonstrated by analogy to Treas.Reg. § 1.613–4, which defines the term "gross income from mining" in the case of hard minerals qualifying for the percentage depletion allowance. To a large degree, both regulations serve a common purpose, for each prescribes the method or methods by which an integrated producer must separate the gross income from sales of its product into two components: (i) gross income derived from extraction of the natural resource, on which percentage depletion is allowed; and (ii) gross income derived from downstream processing of the natural resource, on which percentage depletion is denied. *See Portland Cement,* 450 U.S. at 160–62 & n. 8, 101 S.Ct. at 1041–42 & n. 8 (construing Treas.Reg. § 1.613–4); *Exxon,* 88 F.3d at 970, 975–76 (construing Treas. Reg. § 1.613–3(a)). In so doing, both regulations provide that percentage depletion must be based not upon actual gross income, which is effectively indeterminate in the case of an integrated producer, but upon a formulary, *constructive* gross income. *Portland Cement,* 450 U.S. at 160, 101 S.Ct. at 1041; *Exxon,* 88 F.3d at 970.[19] Underscoring the legislative character of Treas.Reg. § 1.613–4, and of the depletion regulations generally, the Supreme Court has explained:

> Indeed, our customary deference to Treasury Regulations is particularly appropriate in this case, for the Court previously

18. In granting the Secretary of the Treasury the authority to prescribe interpretive regulations, the 1975 version of the Code provided:

> Except where such authority is expressly given by this title to any person other than an officer or employee of the Treasury Department, the Secretary or his delegate shall prescribe all needful rules and regulations for the enforcement of this title, including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue.

§ 7805(a) (1975). The Secretary, in turn, had promulgated a regulation which redelegated this interpretive rulemaking authority to the Commissioner, as follows:

> The Commissioner, with the approval of the Secretary, shall prescribe all needful rules and regulations for the enforcement of the Code (except where this authority is expressly given

by the Code to any person other than an officer or employee of the Treasury Department), including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue.

Treas.Reg. § 301.7805–1(a) (1975).

19. As with integrated natural gas producers, integrated mining firms are directed to use an RMFP methodology in order to compute this constructive gross income. *See* Treas.Reg. § 1.613–4(c). However, whereas Treas.Reg. § 1.613–3(a) prescribes the RMFP as the *exclusive* method of making this computation, Treas. Reg. § 1.613–4 prescribes an alternate "proportionate profits method" which is ordinarily to be employed when the computation of an RMFP is impracticable. Treas.Reg. § 1.613–4(d)(4). It was this proportionate profits method that was at issue in *Portland Cement,* 450 U.S. at 160–64, 101 S.Ct. at 1041–43.

has recognized the necessity of a "broad rule-making delegation" of authority in the area of depletion: "As Congress obviously could not foresee the multifarious circumstances which would involve questions of depletion, it delegated to the Commissioner the duty of making the regulations." *Portland Cement,* 450 U.S. at 169, 101 S.Ct. at 1045 (quoting *Douglas v. Commissioner,* 322 U.S. 275, 280–81, 64 S.Ct. 988, 991–93, 88 L.Ed. 1271 (1944)). *See also id.* at 165, 101 S.Ct. at 1043 ("We find these regulations dispositive."). Based upon the foregoing, the legislative character of Treas.Reg. § 1.613–3(a) is clear beyond cavil.

Defendant urges the court to hold that Treas.Reg. § 1.613–3(a), its legislative character notwithstanding, is a nullity where percentage depletion is allowable pursuant to the post–1974 fixed contract exception of § 613A(b)(1)(B). Our evaluation of defendant's contention is guided by the Supreme Court's two-pronged *Chevron* analysis:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question *whether Congress has directly spoken to the precise question at issue.* If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, *the court does not simply impose its own construction on the statute,* as would be necessary in the absence of an administrative regulation. Rather, if the statute is silent or ambiguous with respect to the

specific issue, the question for the court is *whether the agency's answer is based on a permissible construction of the statute.*

*Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82 (emphasis added). As to the first prong, it cannot be said that "Congress has directly spoken to the precise question at issue," *id.* at 842, 104 S.Ct. at 2781, for § 613A and the related amendments to § 613 fail to define what the "gross income from the property" means in the case of natural gas wells qualifying for the post–1974 fixed contract exception. Likewise, the scant legislative history of the fixed contract exception manifests no affirmative intention on the part of Congress to legislatively repeal Treas.Reg. § 1.613–3(a) where this exception applies. The court declines to infer such an intention since this would affront "the well-established principle of statutory interpretation that implied repeals should be avoided." *United States v. Smith,* 499 U.S. 160, 169, 111 S.Ct. 1180, 1187, 113 L.Ed.2d 134 (1991) (citing *Randall v. Loftsgaarden,* 478 U.S. 647, 661, 106 S.Ct. 3143, 3152, 92 L.Ed.2d 525 (1986) ("[R]epeals by implication are not favored ...")).[20] In this regard, we duly note the Supreme Court's previous rejection of a similar opportunity to expand the scope of the 1975 Act's repeal of the percentage depletion allowance on oil and gas properties beyond the parameters of the statutory text. *See Engle,* 464 U.S. at 225, 104 S.Ct. at 608 ("Had Congress meant to eliminate the percentage depletion allowance on lease bonus and advance royalty income, we believe it would have addressed our decisions to the contrary more explicitly.").

Proceeding to the second prong of the *Chevron* analysis, the question is whether

---

20. *See also Posadas v. National City Bank,* 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936) ("[T]he intention of the legislature to repeal must be clear and manifest...."); *Morton v. Mancari,* 417 U.S. 535, 550–51, 94 S.Ct. 2474, 2482–83, 41 L.Ed.2d 290 (1974); *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 189–90, 98 S.Ct. 2279, 2299–2300, 57 L.Ed.2d 117 (1978). Expounding this venerable canon of statutory construction, Mr. Justice Story professed that "there must be a positive repugnancy between the provisions of the new laws and those of the old; and even then the old law is repealed by implication only, pro tanto, to the extent of the repugnancy." *Wood v. United States,* 41 U.S. (16

Pet.) 342, 363, 10 L.Ed. 987 (1842). Justice Story went on to emphasize the importance of this canon "in the interpretation of all laws for the collection of revenue, whose provisions are often very complicated and numerous to guard against frauds...." *Id.* Here at bar, a comparison of the respective texts of Treas.Reg. § 1.613–3(a), on the one hand, and § 613A and the Treasury Regulations thereunder, on the other, reveals no "positive repugnancy" between said provisions so far as the fixed contract exception of § 613A(b)(1)(B) is concerned. As discussed herein, *infra,* it is scarcely self-evident that harmonizing Treas.Reg. § 1.613–3(a) with the fixed contract exception is an insurmountable task.

Treas.Reg. § 1.613–3(a) "is based upon a permissible construction of" the 1975 Act. *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782. Here the inquiry is not whether Treas.Reg. § 1.613–3(a) is the sole permissible, or even the most reasonable, interpretation of the statutory entitlement to percentage depletion under the fixed contract exception of § 613A(b)(1)(B). On the contrary, as the Supreme Court has repeatedly instructed, judicial deference to the Commissioner's view acknowledges the intent of Congress:

> Alternatives to the Commissioner's ... rule are of course available. Improvements might be imagined. But we do not sit as a committee of revision to perfect the administration of the tax laws.... The role of the judiciary in cases of this sort begins and ends with assuring that the Commissioner's regulations fall within his authority to implement the congressional mandate in *some* reasonable manner.

*Correll,* 389 U.S. at 306–07, 88 S.Ct. at 449–50 (emphasis added). *See also Portland Cement,* 450 U.S. at 169, 101 S.Ct. at 1045 ("These [depletion] regulations command our respect, for Congress has delegated to the Secretary of the Treasury, not to this Court, the task 'of administering the tax laws of this Nation.'") (quoting *United States v. Cartwright,* 411 U.S. 546, 550, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973)); *National Muffler,* 440 U.S. at 488, 99 S.Ct. at 1312 ("The choice among reasonable interpretations [of the Code] is for the Commissioner, not the courts."); *Rowan Cos.,* 452 U.S. at 253, 101 S.Ct. at 2292 ("Where the Commissioner acts under specific authority, our primary inquiry is whether the interpretation or method is within the delegation of authority.").

■ With the foregoing considerations in mind, courts pay a "very high degree of deference" to legislative regulations, "according them 'controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.'" *Schuler,* 109 F.3d at 755 (quoting *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782). Deference to Treas.Reg. § 1.613–3(a) is particularly appropriate, even following the enactment of § 613A into law, insofar as the Code fails to define the meaning of the "gross income from the property"—a pivotal element of the percentage depletion computation—in the case of natural gas wells. Thus, Congress plainly intended that the Secretary would exercise his specific rule-making authority under § 611(a) to define the meaning of the "gross income from the property" in such cases, and it is equally plain that Treas.Reg. § 1.613–3(a) is the result of said rulemaking. "Where Congress has delegated authority to prescribe rules and uses terms that lack specific definition, greater latitude is afforded the Secretary than in those situations where the terms have well defined meanings." *Dow Corning Corp. v. United States,* 984 F.2d 416, 420 (Fed.Cir.1993) (citing *Vogel Fertilizer,* 455 U.S. at 26, 102 S.Ct. at 828).

In applying the aforesaid principles to the case at bar, the court takes it as settled that, prior to 1975, Treas.Reg. § 1.613–3(a) validly applied to every case in which an integrated natural gas producer claimed an allowance for percentage depletion, even where the resultant RMFP exceeded the actual selling price of the natural gas in question. *See Exxon,* 88 F.3d at 975–76, 980. Stated differently, Treas.Reg. § 1.613–3(a) was "based upon a permissible construction of" the statutory percentage depletion scheme in place prior to 1975. *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2781–82. The question for decision, then, given the enactment of § 613A into law, is whether Treas.Reg. § 1.613–3(a) is a "permissible construction" of the post–1974 statutory percentage depletion scheme, where the allowance for percentage depletion is premised upon the fixed contract exception of § 613A(b)(1)(B).

Defendant contends that, as a matter of law, the court must answer the foregoing question in the negative. The conclusion defendant advocates may be reached only upon a determination that Treas.Reg. § 1.613–3(a) produces results which are arbitrary, capricious, or manifestly contrary to the post–1974 statutory percentage depletion scheme. *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782–83; *Portland Cement,* 450 U.S. at 169, 101 S.Ct. at 1045–46; *Schuler,* 109 F.3d at 755. As noted above, the court might narrowly limit such a holding to the facts of this case or, in the alternative, the court might broadly

hold that Treas.Reg. § 1.613–3(a) is facially invalid whenever the post–1974 fixed contract exception applies. For the reasons stated hereinafter, defendant's motion for summary judgment can be sustained on neither of these grounds, which the court shall now address *seriatim.*

### I. *Validity Of Treas. Reg. § 1.613–3(a) As Applied To The Case At Bar*

■ The question of law presented in the instant case is precisely the same issue on which the Tax Court ruled in defendant's favor with respect to Exxon's 1979 taxable year. *See Exxon*, 102 T.C. 721.[21] Reluctant to declare Treas.Reg. § 1.613–3(a) facially invalid whenever the post–1974 fixed contract exception applies, the Tax Court stressed that "the statute at issue provides for a *'reasonable* allowance for depletion' under the *'peculiar conditions in each case.'*" *Id.* at 744 (quoting § 611(a)) (emphasis added). On that basis, the Tax Court ruled narrowly that the RMFP was inapplicable to the specific facts before it:

In reaching this conclusion, we do not hold that the regulation is invalid; we hold only that the method provided by the last sentence is not applicable to the facts of this case. There may be particular situations in which it is reasonable based upon the "peculiar facts" to allow use of the RMFP even where it exceeds the taxpayer's actual gross income. We are not prepared even to attempt to define such situations or to delineate for other cases where the use of the RMFP may or may not be unreasonable. We hold only that its use would be unreasonable here where *the result of using RMFP's is five times the actual sales proceeds* from the sale of gas after it was transported away from the wellhead.

*Exxon*, 102 T.C. at 744 n. 28 (emphasis added). Although we find the Tax Court's opinion instructive, if not intriguing, in many respects, its case-specific reasonableness analysis raises genuine issues of material fact that cannot be resolved summarily.[22] In the case at bar, unlike the proceedings before the Tax Court, a number of facts indispensable to this reasonableness inquiry have not been established: (i) the amount of the actual gross income that Exxon recognized from the 1975 natural gas sales in question; (ii) the amount of the constructive "gross income from the property" derived from the applica-

---

**21.** The Tax Court's ruling as to Exxon's 1979 taxable year has no preclusive effect with regard to Exxon's 1975 taxable year. It is, of course, within the court's prerogative to raise the doctrine of collateral estoppel *sua sponte. Chandler v. United States*, 31 Fed.Cl. 106, 110 (citations omitted), *aff'd by unpublished order*, 39 F.3d 1196 (Fed.Cir.1994); *Liles v. United States*, 219 Ct.Cl. 619, 620, 1979 WL 30845 (1979). However, "where two cases involve income taxes in two different taxable years, collateral estoppel ... [is] confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where *the controlling facts and applicable legal rules remain unchanged." Commissioner v. Sunnen*, 333 U.S. 591, 599–600, 68 S.Ct. 715, 720, 92 L.Ed. 898 (1948) (emphasis added) (citation omitted). Neither of the *Sunnen* prerequisites for the application of collateral estoppel is met here. First, whether the "controlling facts" in the Tax Court litigation are the same as the controlling facts in the present case is a genuine issue of material fact which cannot be resolved by summary disposition. Second, we cannot confidently state that the "applicable legal rules" are unchanged. After the Tax Court rendered its decision in June of 1994, the Federal Circuit reached the opposite conclusion two years later with respect to Exxon's 1974 taxable year. *Exx-*

on, 88 F.3d 968. Although the Federal Circuit's decision necessarily did not take the 1975 Act into account, our senior court's pronouncements regarding Treas.Reg. § 1.613–3(a) command this court's attentive consideration.

**22.** We duly note, moreover, the Federal Circuit's holding, pertinent to Exxon's 1974 taxable year, that "a depletion allowance pursuant to Treas. Reg. § 1.613–3(a) is per se reasonable, *absent a challenge to the regulation itself." Exxon*, 88 F.3d at 980 (emphasis added). With obvious reference to the legislative character of Treas. Reg. § 1.613–3(a), the Federal Circuit went on to explain that "our scope of review is limited to the reasonableness of the regulations and not the reasonableness of any individual allowance." *Id.* While this suggests that a case-specific inquiry into the reasonableness of an RMFP calculated pursuant to Treas.Reg. § 1.613–3(a) is inappropriate here at bar, two distinctions bear consideration. First, unlike the litigation over Exxon's 1974 percentage depletion allowance, the present case involves a challenge to Treas.Reg. § 1.613–3(a) itself. Second, this challenge is rooted in the fixed contract exception of § 613A(b)(1)(B), a statutory enactment not in existence in 1974. The court need not yet address the legal significance of these distinctions, however, given the immediate procedural posture of this case.

tion of Exxon's purported RMFP to said transactions; or (iii) the amount of the percentage depletion allowance to which Exxon claims it is entitled.[23] Each of these matters constitutes a triable issue of fact. Consequently, we cannot conclude, as a matter of law, that Treas.Reg. § 1.613–3(a), as applied to the facts of this case, produces a result that is arbitrary, capricious, or manifestly contrary to the post–1974 statutory percentage depletion scheme.

## II. Facial Validity Of Treas.Reg. § 1.613–3(a)

■ Despite defendant's exhortations, the court is unable to reach the sweeping conclusion that, as a matter of law, Treas.Reg. § 1.613–3(a) never applies when an integrated natural gas producer claims a percentage depletion deduction pursuant to the post–1974 fixed contract exception. There is, we note, not even a scintilla of evidence before the court suggesting that Treas.Reg. § 1.613–3(a) systematically causes a material distortion of the "gross income from the property" in such cases. Unaccompanied by compelling evidence of this nature, defendant's objections concerning Treas.Reg. § 1.613–3(a) are directed to the wrong forum. Defendant, in essence, asks the court to add to Treas.Reg. § 1.613–3(a) a proviso to the effect that actual gross income, not the

RMFP method, must be used where the post–1974 fixed contract exception applies. However, the Federal Circuit has already pointed out the stunning incongruity of defendant's entreaty.

> We note that pursuant to the broad authority delegated to him, the Secretary can amend Treas.Reg. § 1.613–3(a) if he so desires to limit the RMFP to actual gross income.... Until the Secretary imposes such a cap in the oil and gas area, we believe it is not within our judicial powers to legislate it in his stead.

Exxon, 88 F.3d at 974–75 (citing Hugoton II, 349 F.2d at 430 (to same effect)). See also Engle, 464 U.S. at 226–27, 104 S.Ct. at 609–10 (Commissioner possesses ability to resolve asserted problems with depletion computations by prescribing regulations); Exxon, 102 T.C. at 726 (citing cases). Thus, defendant should preferably direct its request not to this court, but to the Secretary.[24]

■ Moreover, it is well settled that "Treasury regulations and interpretations long continued without substantial change, applying to unamended or substantially reenacted statutes, are deemed to have received congressional approval and have the effect of law." Helvering v. Winmill, 305 U.S. 79, 83, 59 S.Ct. 45, 46, 83 L.Ed. 52 (1938), followed in Cottage Savings Assn. v. Commissioner,

**23.** The Tax Court reached its decision on the parties' cross-motions for partial summary judgment. Exxon, 102 T.C. at 722. For its 1979 taxable year, Exxon asserted an RMFP which resulted in a constructive "gross income from the property" exceeding $495 million, and a percentage depletion allowance in the amount of $109,017,036. Id. at 723. Exxon's actual gross revenue from the fixed price natural gas contracts in question was roughly $95,502,000. Id. Apparently, these facts were deemed established by concession of the parties or by affidavit. Id. at 723–24 & n. 5. Thus, Exxon's constructive "gross income from the property" was five times the actual gross income from the transactions in question. Moreover, Exxon's claimed percentage depletion deduction literally exceeded the actual gross income from the underlying natural gas sales, suggesting that, had Exxon prevailed, said transactions would have generated a deductible paper loss exceeding $13 million solely by virtue of percentage depletion.

Because no such facts have been stipulated, conceded, attested to by affidavit, or otherwise established respecting Exxon's 1975 taxable year,

whether Treas.Reg. § 1.613–3(a) produces a similar outcome in the present case is a genuine question of material fact. At this juncture, the court need not consider whether such a shocking result would so offend the statutory percentage depletion scheme as to render Treas.Reg. § 1.613–3(a) inapplicable.

**24.** This point easily disposes of defendant's citation, otherwise accurate, of the maxim that income tax deductions are a matter of legislative grace and are to be narrowly construed. See, e.g., INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84, 112 S.Ct. 1039, 1042–43, 117 L.Ed.2d 226 (1992); Commissioner v. Sullivan, 356 U.S. 27, 28, 78 S.Ct. 512, 513–14, 2 L.Ed.2d 559 (1958); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440, 54 S.Ct. 788, 790–91, 78 L.Ed. 1348 (1934). Here, it is fully within defendant's power to impose its preferred construction upon the income tax deduction in question, but defendant has neglected to do so. In these circumstances, to permit defendant to escape its self-inflicted dilemma by parroting the foregoing maxim would surely reduce this maxim to a mere shibboleth.

499 U.S. 554, 561–62, 111 S.Ct. 1503, 1508–09, 113 L.Ed.2d 589 (1991). *See also National Muffler,* 440 U.S. at 477, 99 S.Ct. at 1307; *Correll,* 389 U.S. at 305–06, 88 S.Ct. at 448–49. Prior to the Tax Reduction Act of 1975, the statutory percentage depletion scheme and regulations thereunder had "changed only slightly since the 1930s." *Exxon,* 33 Fed.Cl. at 255.[25] As a consequence, following decades of statutory and regulatory constancy in the area of percentage depletion, Treas.Reg. § 1.613–3(a) "remain[ed] of unquestioned validity" in 1974. *Exxon,* 88 F.3d at 980.

█ To be sure, upon the enactment of § 613A into law in 1975, it could no longer be said that Treas.Reg. § 1.613–3(a) rested upon a statutory percentage depletion scheme that had long remained "unamended or substantially reenacted." *Winmill,* 305 U.S. at 83, 59 S.Ct. at 46–47. However, the Secretary thereafter promulgated extensive regulations under new § 613A, for the purpose of implementing the repeal of percentage depletion and the exceptions thereto, including the fixed contract exception at issue here. *See* Treas.Reg. §§ 1.613A–0 through 1.613A–7; T.D. 7487, 42 Fed.Reg. 24,264 (May 13, 1977). "A regulation may

have particular force if it is a substantially contemporaneous construction of the statute by those presumed to have been aware of congressional intent." *National Muffler,* 440 U.S. at 477, 99 S.Ct. at 1307. Section 613A was no doubt given "a substantially contemporaneous construction" by the new regulations thereunder. Especially significant, we think, in the midst of this comprehensive overhaul of the percentage depletion regulations, was the retention of Treas.Reg. § 613–3(a) unamended in the Code of Federal Regulations.[26] Continuing in this vein, the court is constrained to observe that 22 years after the events at issue in this litigation, Treas.Reg. § 1.613–3(a) remains on the books unaltered still. Furthermore, even as recently as 1990, the Internal Revenue Service publicly cited Treas.Reg. § 1.613–3(a) as authoritative with respect to the post–1974 fixed contract exception. *See* Rev. Rul. 90–62, 1990–2 C.B. 158.[27]

█ In short, the Secretary's lassitude in amending Treas.Reg. § 1.613–3(a), so as to achieve the result defendant contends for here, provides no mandate for judicial interference in regulatory tax policy making. *See Exxon,* 88 F.3d at 974–75; *Woods Invest-*

**25.** Section 613 and its statutory predecessors, authorizing the percentage depletion allowance, date to the Revenue Act of 1926, ch. 27, § 204(c)(2), 44 Stat. 9 (1927). Similarly, Treas. Reg. § 1.613–3(a) or substantially identical predecessor regulations have been continuously in effect since 1922. *See* Treas.Reg. 62 (1922 ed.), Art. 201(h) (defining "gross income from the property" for percentage depletion purposes in terms of the "market or field price of the raw material before conversion"). *See generally Exxon,* 33 Fed.Cl. at 253–56 (history of statutory and regulatory provisions relating to percentage depletion); 88 F.3d at 971 (noting "admirable clarity" of trial court's historical analysis of percentage depletion deduction and tacitly adopting same).

**26.** On the other hand, the mere fact that Treas. Reg. § 1.613–3(a) had not been withdrawn from the Code of Federal Regulations in 1975 would not save it from invalidity, if its application would override a clearly stated statutory requirement. *Barseback Kraft AB v. United States,* 121 F.3d 1475, 1480 (Fed.Cir.1997) (citations omitted). In any case, Treas.Reg. § 1.613–3(a) controverts no clearly stated statutory requirement. As discussed herein, *supra,* the Code fails to define the meaning of "gross income from the

property" in the case of oil and gas wells, leaving this matter instead to the Secretary's broad statutory rulemaking authority in the depletion area. *See* § 611(a); *Portland Cement,* 450 U.S. at 169, 101 S.Ct. at 1045–46.

**27.** Revenue Ruling 90–62 concluded that Treas. Reg. § 1.613–3(a) implicitly limits the RMFP to actual gross income, a conclusion firmly rejected by both the Federal Circuit and this court in the litigation involving Exxon's 1974 percentage depletion computation. *See Exxon,* 88 F.3d at 976, 33 Fed.Cl. at 269. Although we find defendant's strained efforts to distance itself from its own Revenue Ruling unpersuasive, neither do we find the Revenue Ruling itself dispositive insofar as it does not have the force and effect of law and Treasury Regulations. *See Stubbs Overbeck & Assoc. v. United States,* 445 F.2d 1142, 1146–47 (5th Cir.1971) ("A [revenue] ruling is merely the opinion of a lawyer in the agency and must be accepted as such. It may be helpful in interpreting a statute, but it is not binding on ... the courts."), *quoted with approval in State Bank of Albany v. United States,* 209 Ct.Cl. 13, 530 F.2d 1379, 1382 (1976). *See also Spang Indus., Inc. v. United States,* 791 F.2d 906, 913 (Fed.Cir.1986); *Mulholland v. United States,* 25 Cl.Ct. 748, 757 n. 19 (1992).

*ment Co. v. Commissioner*, 85 T.C. 274, 282, 1985 WL 15380 (1985) ("Since [the Commissioner] has not taken steps to amend his regulations, we believe his apparent reluctance to use his broad power in this area does not justify judicial interference in what is essentially a legislative and administrative matter."). This conclusion acknowledges fully that Treas.Reg. § 1.613–3(a) is legislative in character and, therefore, entitled to deference. *See Portland Cement*, 450 U.S. at 169, 101 S.Ct. at 1045–46; *Rowan Cos.*, 452 U.S. at 253, 101 S.Ct. at 2292–93; *National Muffler*, 440 U.S. at 488, 99 S.Ct. at 1312–13; *Correll*, 389 U.S. at 306–07, 88 S.Ct. at 449–50; *Exxon*, 88 F.3d at 980. The canons of construction relative to statutes apply with equal force to legislative regulations. *Trustees of Ind. Univ. v. United States*, 223 Ct.Cl. 88, 618 F.2d 736, 739 (1980); *Exxon*, 102 T.C. at 727 (citations omitted). *See also Schuler*, 109 F.3d at 755 (legislative Treasury Regulation must be given "legislative effect").

It is axiomatic that "[t]he cardinal principle of statutory construction is to save and not to destroy." *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 30, 57 S.Ct. 615, 621, 81 L.Ed. 893 (1937), *followed in Tallman v. Brown*, 105 F.3d 613, 616 (Fed. Cir.1997). Thus, if fairly possible, legislative regulations must be construed to avoid conflict with a statute. *Smith v. Brown*, 35 F.3d 1516, 1526 (Fed.Cir.1994) (citations omitted); *Trustees of Ind. Univ.*, 618 F.2d at 739 (regulation must be construed so as to harmonize, not conflict, with objective of statute it implements). *See also National Muffler*, 440 U.S. at 477, 99 S.Ct. at 1307 ("In determining whether a particular [Treasury] [R]egulation carries out the congressional mandate in a proper manner, we look to see whether the regulation *harmonizes* with the plain language of the statute, its origin, and its purpose." (emphasis added)). It naturally follows that Treas.Reg. § 1.613–3(a) may not be construed in a manner which yields an absurd result; rather, we must seek a construction which is consistent with the post–1974 statutory percentage depletion scheme. *Hellebrand v. Secretary of DHHS*, 999 F.2d 1565, 1570–71 (Fed.Cir.1993). *See also Exxon*, 88 F.3d at 975 (Treas.Reg. § 1.613–3(a) "must not be read in a vacuum, but instead in light of the entire law and its object and policy.") (citing *John Hancock Mut. Life Ins. Co. v. Harris Trust & Savings Bank*, 510 U.S. 86, 94–95, 114 S.Ct. 517, 523–24, 126 L.Ed.2d 524 (1993); *Trustees of Ind. Univ.*, 618 F.2d at 739).

Having reflected at length upon the post–1974 statutory percentage depletion scheme, the court rejects defendant's contention that percentage depletion must be computed upon the actual sales prices of natural gas sold in transactions qualifying for the fixed contract exception. Defendant's exclusive emphasis upon actual sales prices permits no downward adjustment of the "gross income from the property" for value added by Exxon's downstream processing. For this reason alone, defendant's theory is untenable. Nothing in the 1975 Act or its legislative history suggests that Congress contemplated such a radical departure from the prior law of percentage depletion as it had stood for over 50 years. If Exxon were required to calculate percentage depletion on the actual sales prices of gas sold pursuant to its long-term fixed price contracts, without reduction for value added by downstream processing, Exxon would occupy a position superior to nonintegrated producers selling gas at the wellhead under long-term fixed price contracts. This result would violate the well-settled tenet that "integrated operators should not receive preferred treatment" by virtue of the allowance for percentage depletion. *Cannelton*, 364 U.S. at 87, 80 S.Ct. at 1587. *See also Exxon*, 88 F.3d at 975–76; *Hugoton II*, 349 F.2d at 425–27; *Exxon*, 102 T.C. at 733–34.

The potency of defendant's argument is further depleted by the 1975 Act's favorable treatment of nonintegrated natural gas producers. No longer was Congress satisfied with a percentage depletion allowance crafted to maintain integrated and nonintegrated producers on an equal competitive footing. On the contrary, "Congress wanted to ... *improve the competitive position of 'small producers'*—the independents and the royalty owners—vis-a-vis the major integrated ones." *Engle*, 464 U.S. at 217–18, 104 S.Ct. at 604–05 (emphasis added). *See also Exxon*, 102 T.C. at 734. Under the "small pro-

ducer" exception to the general repeal of percentage depletion, independent producers and royalty owners were entitled to claim percentage depletion on 12,000 Mcf of natural gas production in 1975, with the quantity of qualifying gas production scaling down gradually to 6,000 Mcf per annum for 1980 and thereafter. § 613A(c). Congress expressly prohibited integrated producers from availing themselves of the small producer exception. *See* §§ 613A(c)(2), (c)(4) (small producer exception inapplicable to natural gas refiners and retailers). Given Congress' deliberate expression of solicitude for nonintegrated natural gas producers, it strains credulity to suggest, as defendant does, that the post–1974 fixed contract exception tacitly conferred upon integrated producers an unprecedented advantage—the right to compute percentage depletion on actual sales prices, inclusive of value added by downstream processing.

We acknowledge, of course, that the aforesaid considerations regarding the respective competitive postures of integrated and nonintegrated producers also militate in favor of defendant's position to a certain degree. The gravamen of defendant's argument is that an uncritical, mechanical application of Treas.Reg. § 1.613–3(a), in a rising natural gas market and in conjunction with the post–1974 fixed contract exception, discriminates between integrated producers and similarly situated nonintegrated producers, to the detriment of the latter. That is, Exxon's status as an integrated producer would entitle it to compute percentage depletion on an RMFP exceeding the actual gross income from its sales of gas pursuant to long-term fixed price contracts. Conversely, a nonintegrated producer bound by long-term contracts of similar vintage and fixed price terms would be entitled to a lesser percentage depletion allowance computed on the basis of actual gross income.[28] However plausible this scenario may be,[29] such conjecture does not entitle defendant to judgment as a matter of law. Whether Treas.Reg. § 1.613–3(a) systematically places nonintegrated producers at a competitive disadvantage is a question which turns upon complex factual determinations requiring a trial on the merits. Therefore, the court is precluded from deciding whether, as a matter of law, such an outcome would threaten the integrity of the post–1974 statutory percentage depletion scheme and thereby invalidate the application of Treas. Reg. § 1.613–3(a) in cases to which the fixed contract exception applies.

Even assuming, *arguendo*, that the dire consequences postulated by defendant are truly a palpable threat, the court is unpersuaded that harmonizing Treas.Reg. § 1.613–3(a) with the post–1974 statutory percentage depletion scheme is an insurmountable task. Defendant protests the results which flow from the RMFP method in a rising natural gas market, but seemingly overlooks the possibility that the computational mechanics of the RMFP might be adjusted to accommodate the fixed contract exception in such circumstances.[30] The RMFP is a weighted

---

**28.** A nonintegrated producer entitled to percentage depletion under the small producer exception of § 613A(c) would also be at a competitive disadvantage, but for a different reason. In that event, both the nonintegrated producer's actual gross income and the integrated producer's RMFP would approximately reflect the prevailing per-unit market price. However, the nonintegrated producer would compute its percentage depletion allowance by reference to a relatively small *volume* of natural gas production, *i.e.*, 12,000 Mcf in 1975. §§ 613A(c)(3), (c)(4). An integrated producer, on the other hand, is subject to no statutory volume constraint when it computes percentage depletion pursuant to the post–1974 fixed contract exception. While the fixed contracts themselves may impose volume limitations, such restrictions seem fairly capacious in Exxon's case. Exxon's complaint asserts that the IRS incorrectly disal-

lowed percentage depletion deductions, claimed by Exxon on the basis of its RMFP, in the sum of roughly $120 million. Exxon further asserts, note 2 *supra*, that the RMFP for its 1975 taxable year was $0.77/Mcf. Simple arithmetic instructs that Exxon's purported 1975 percentage depletion allowance under the fixed contract exception must be based upon a volume of natural gas production running, at a minimum, *into the hundreds of millions of Mcf.*

**29.** *See Exxon*, 88 F.3d at 975, 976 n. 7 (alluding to the existence of long-term fixed price natural gas contracts entered into by nonintegrated producers).

**30.** Assuredly, in deciding defendant's motion for summary judgment, it is not the court's intention to catalogue every conceivable means by which Treas.Reg. § 1.613–3(a) can be harmoniously

average price derived from a sample of wellhead sales of natural gas in the integrated producer's market during the taxable year in question. *Exxon*, 88 F.3d at 976. Controlling precedent firmly establishes that the sample must produce "a *representative* market or field price." *Exxon*, 88 F.3d at 980 (emphasis in original). *See Panhandle*, 408 F.2d at 716 (rejecting imperfectly "representative" RMFP); *Hugoton I*, 315 F.2d at 877 (same). By definition, "the *representative* price is the price which is in fact being obtained under all existing *comparable* contracts." *Hugoton I*, 315 F.2d at 874 (emphasis added). *See also Hugoton II*, 349 F.2d at 427 (RMFP requires consideration of "comparable sales"); *Panhandle*, 408 F.2d at 701 (RMFP requires consideration of gas sales "by other producers similarly situated").

From the viewpoint of an integrated producer computing percentage depletion under the post–1974 fixed contract exception and Treas.Reg. § 1.613–3(a), it seems readily apparent that the sample of "comparable" contracts should be limited to long-term fixed price contracts for the wellhead sale of natural gas that were in effect as of February 1, 1975. This conclusion inheres in the very essence of a "fixed contract," which the Code defines as "a contract, in effect on February 1, 1975, ... under which the price for such gas cannot be adjusted to reflect to any extent the increase in liabilities of the seller

for tax under this chapter by reason of the repeal of percentage depletion." § 613A(b)(2)(A). If the price specified in a fixed contract is increased after February 1, 1975, natural gas sold thereunder is thereafter ineligible for percentage depletion, unless the integrated producer demonstrates by clear and convincing evidence that the price increase was not motivated by the repeal of percentage depletion. *Id.*

Thus, as a general matter, an integrated natural gas producer cannot claim a larger percentage depletion deduction after February 1, 1975, by taking the direct step of raising its fixed contract price. In other words, an integrated natural gas producer's post–1974 percentage depletion deduction is, by design, unresponsive to market conditions. Yet, if the RMFP sample is not restricted to long-term fixed price contracts entered into prior to February 1, 1975, then the integrated producer's percentage depletion deduction is *indirectly* responsive to market conditions, since its RMFP will reflect price increases made by nonintegrated producers that are unconstrained by long-term fixed price contracts.[31] Of course, as already noted herein, the court cannot summarily determine whether this result would upset the competitive balance that Congress sought to strike between integrated and nonintegrated producers in the 1975 Act.[32] For

construed. Even so, solely for demonstrative purposes, we find it useful to consider one possible interpretive approach.

**31.** Segregating contracts entered into before February 1, 1975, from those entered into thereafter does not constitute the sort of vintaging analysis of the sort found unnecessary by this court in the litigation concerning Exxon's percentage depletion computation for its 1974 taxable year. *See Exxon*, 33 Fed.Cl. at 280–81 (citing *Hugoton I*, 315 F.2d at 876–77), *rev'd on unrelated grounds*, 88 F.3d 968. Full-blown vintaging would involve more than two classes of contracts, since the object would be to construct an RMFP sample comprised of long-term fixed price contracts of corresponding vintage, *i.e.*, entered into in each of the year(s) in which Exxon's fixed contracts were entered into.

**32.** We are also mindful that the Federal Circuit has firmly rejected the notion that, under pre–1975 law, Treas.Reg. § 1.613–3(a) "requires that integrated producers in long term contracts receive no tax advantages over nonintegrated pro-

ducers in long term contracts." *Exxon*, 88 F.3d at 975. Observing that "[t]he RMFP in the present case exceeds the actual gross income based on market forces and not based on downstream processing," the Federal Circuit reasoned that the pre–1975 legislative history "addresse[d] the effects of downstream processing, [but was] silent as to changes in market conditions." *Exxon*, 88 F.3d at 976. It is a fair question whether the Federal Circuit would reach the same conclusion in the present case, since Congress plainly enacted the 1975 Act into law in response to changes in market conditions. *See Engle*, 464 U.S. at 211, 104 S.Ct. at 601. Moreover, a post–1974 RMFP sample constructed from comparable fixed price contracts entered into prior to February 1, 1975, would still allow an integrated producer to benefit from the run-up in natural gas prices prior to February 1, 1975. Therefore, insofar as the RMFP would reflect such market price increases, the integrated producer would remain fully entitled to whatever benefits it was entitled to under the Federal Circuit's view of the pre–1975 law of percentage depletion.

present purposes, it suffices to say that disharmony between Treas.Reg. § 1.613–3(a) and the post–1974 statutory percentage depletion scheme is not, as defendant would have it, a foregone conclusion. Accordingly, the court is unable to conclude that, as a matter of law, Treas.Reg. § 1.613–3(a) *never* governs the computation of percentage depletion in cases arising under the post–1974 fixed contract exception.

## CONCLUSION

Based upon the foregoing analysis, this court holds that defendant is not entitled to judgment, as a matter of law, on the ground that an integrated natural gas producer's percentage depletion allowance under the post–1974 fixed contract exception of § 613A(b)(1)(B) must be computed by reference to the actual gross income received pursuant to the fixed contracts in question, as opposed to the RMFP determined pursuant to Treas.Reg. § 1.613–3(a). Therefore, defendant's motion for summary judgment, filed on July 30, 1997, is hereby DENIED. This case shall henceforth proceed to trial, which shall commence at 10:00 a.m. on January 26, 1998, at the National Courts Building in Washington, D. C.[33]

IT IS SO ORDERED.

---

[33]. Lest the court's ruling be misconstrued, we do *not* by this opinion hold that Exxon's percentage depletion computation for its 1975 taxable year, made pursuant to the fixed contract exception of § 613A(b)(1)(B) and Treas.Reg. § 1.613–3(a), must conform in all material particulars to the percentage depletion computation approved by the Federal Circuit with regard to Exxon's 1974 taxable year. *See Exxon,* 88 F.3d at 975–81. Exxon advances this contention solely in response to defendant's summary judgment motion, not in a duly filed cross-motion for partial summary judgment. Consequently, this question is not properly before the court, and we express *no opinion regarding the merits of Exxon's* position.